J-A27029-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NESTER LUIS DIAZ | : | |
| | : | |
| Appellant | : | No. 1488 MDA 2023 |

Appeal from the Judgment of Sentence Entered June 13, 2023
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s):  CP-40-CR-0001725-2020

BEFORE:  LAZARUS, P.J., KUNSELMAN, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:        **FILED: APRIL 3, 2025**

Nester Luis Diaz appeals from the judgment of sentence imposed following his convictions for aggravated indecent assault of a person less than 13 years of age, indecent assault of a person less than 13 years of age, and corruption of minors.[1] He raises evidentiary issues and challenges the denial of a motion for judgment of acquittal. We affirm.

The trial court accurately summarized the facts as follows:

> The victim, J.T., who was fifteen years old at the time of trial, testified that the forty-four[-]year[-]old [Diaz] is her uncle by marriage. J.T. said that in July and August of 2019, when she was eleven years old, she lived with [Diaz] in Patterson, New Jersey. The victim said that her mother lived in Wilkes-Barre at the time. J.T. said that she was staying in Patterson with [Diaz] because she was taking classes twice a week to prepare to be in a beauty pageant. Also residing in the house in New Jersey were her aunt and four cousins. Her aunt . . . is the sister of the victim's mother

---

[1] 18 Pa.C.S.A. §§ 3125(a)(7), 3126(a)(7), and 6301(a)(1)(ii), respectively.

and the wife of [Diaz]. The victim said that while her cousins were attending school classes and her aunt was working, [Diaz] was at home. J.T. said she slept in the top bunk of a bed in a room she shared with her cousins. She testified that the pageant classes took place in the afternoons from 2:00 until 7:00 p.m. She said she would lay in bed all day. J.T. testified that one morning, while she was half asleep in her top bunk, [Diaz] came [into] the room and rubbed her leg to wake her up. She said it made her feel uncomfortable. J.T. said that she tried to fake sleep because she was scared and nervous of what would happen next if she was up. She said after he touched her leg, he would then put his hand near her stomach and slide his hand down her pants and underwear. She said he rubbed the outside of her "private part" with his hand and touched the inside with two fingers and it hurt. J.T. said [Diaz] engaged in this behavior about five times while she was living in New Jersey. In addition, she said that on one occasion he called her into his bedroom one morning where he laid her down, pulled down her pants and attempted to insert his private part into hers which caused pain. J.T. said that he stopped because there was a knock on the door. She testified that [Diaz] also touched his own "private part" until he ejaculated. She said he called it "jerking off" and he only stopped when there was a substance that looked like Elmer's glue. J.T. said he cleaned it up with a towel on the bed frame in his room. She said that [Diaz] tried to grab her hand to touch his private part but she was disgusted and would not consent. J.T. said [Diaz] threatened that if she told anyone "her mother's life would pay" and that nobody would believe her. After the pageant was over, the victim's mother . . . came to pick her up and she went to live with her in Wilkes-Barre.

While J.T. and her mother were living in Wilkes-Barre, [Diaz] and the victim's aunt and cousins came to visit on the weekends. She said that knowing that [Diaz] was back in the picture made her feel uncomfortable and scared. J.T. said that when [Diaz] and his family visited, they slept in the living room with her aunt and [Diaz] sharing an air mattress. The victim further testified that she slept on another air mattress with her cousin. J.T. testified that while everyone else was asleep, [Diaz] would pull the mattress she was sleeping on closer to him and touch her chest and the private part in between her legs with his hand. She said

that he touched both the inside and outside of her private parts. She testified that he put his fingers inside her private part. She said that while they were in Wilkes-Barre, he again threatened her not to say anything. He told her that "no one would really know about any of us because we're alone there, and if we die no one would know." J.T. said [Diaz] bought her bras, underwear and clothing and that he took pictures of her wearing the clothing on his phone. She said she only wore the things once because she would have been disgusted with herself if she had worn them more than once. J.T. also testified that he showed her a video of her aunt and [Diaz's] friend that [Diaz] had recorded. She said that in the video, her aunt was on top of his friend with his private part in hers while he was touching his private part. She said [Diaz] told her that people do that eventually when they love each other. J.T. said that she was disgusted by the video.

The victim testified that after a few months, she moved to Mountain Top between Christmas and New Year's Day. J.T. said that she, her mother, her aunt, cousins, and [Diaz] all lived together in the house. She testified that at the time they moved into the house, she still had not told anyone about the inappropriate contact with [Diaz] because she had been threatened not to tell. J.T. said that the inappropriate contact continued on three occasions in Mountain Top. On the last occasion which she said occurred in 2019, she was downstairs playing with her cousin when [Diaz] called her upstairs to the guest room. She said that when she walked in, he was wearing a shirt and boxers and he told her to get on the bed. When she refused, he told her again and grabbed her arm with "a hard grip." She said that while he was behind her, he laid her in front of him and pulled his boxers down. J.T. said he took down her pants and underwear and put his private part into hers. She said she screamed in pain and told him to stop. J.T. said [Diaz] said "no", grabbed her waist and "proceeded to have his private part" all the way in her. She said he stopped when her eight year old cousin came upstairs and opened the door. She said [Diaz] "freaked out," yelled at her cousin, and left the room. J.T. said that afterwards she felt disgusted, in pain, and scared. The other two times [Diaz] touched her in Mountain Top he touched her chest and private area.

J.T. further testified that in the summer of 2020, she disclosed the abuse to her mother. J.T. said she did not want to tell, but they were driving in the car and her mother asked her if there was anything wrong with her and said she had noticed some "weird behavior" around her and [Diaz]. She said her mother noticed that her behavior had changed and she was misbehaving. J.T. said her mom asked her questions for about thirty minutes before she answered. Although she was afraid for her mother, she told her about the abuse. J.T. said her mother called her aunt and told her to get out of the house. She said her mother also texted [Diaz] to pack their things and go. J.T. said she and her mother then went to a friend's house, called the police, and went to the Mountain Top police station. She said the police in Mountain Top told them to go to the Wilkes-Barre police. J.T. testified that on the same day, they went to the Wilkes-Barre police station and she was interviewed by the police there.

Trial Court Opinion, filed 1/31/24, at 2-5 (citations to record and footnotes omitted).

Lieutenant Matthew Stash testified at trial that he was on duty when the victim and her mother came to the Wilkes-Barre police department. He stated without objection that "it was immediately apparent to me that they really needed my help." N.T. Trial, 1/23/23, at 86. He conducted a minimal interview and then set up an interview at the Child Advocacy Center ("CAC"). During his interview of J.T., he noticed that "there was some trauma there" and "it was immediately apparent to me that this girl had been the victim of some type of sexual crime." *Id.* at 92-93.

Diaz was charged with rape of a child (count one), sexual assault (count two), statutory sexual assault (count three), aggravated indecent assault of a

person less than 13 years of age (count four), indecent assault of a person less than 13 years of age (count five), and corruption of minors (count six).

After the Commonwealth's case-in-chief, Diaz made an oral motion for judgment of acquittal on counts one, two, and three. N.T. Trial at 111-114. The trial court granted Diaz's motion for judgment of acquittal on those counts. *See id.* at 115-116.

Diaz testified on his own behalf and denied that anything of a sexual nature occurred between himself and J.T. *Id.* at 121, 129, 131.

During the trial, the court gave the jury the following cautionary instruction about its use of evidence of other, uncharged acts:

> Ladies and gentlemen, you've heard some testimony regarding incidents occurring in New Jersey, as well as Mountain Top. The evidence was allowed for a particular purpose since Defendant is not criminally charged for that alleged conduct. If the evidence is believed by you, it can only be considered to establish or prove opportunity, intent, common plan and to show the complete history of the case here or the circumstances here.
>
> I will give you a further instruction on that as we go forward.

*Id.* at 81. The trial court gave a second cautionary instruction about the same evidence during its charge to the jury. *Id.* at 175.

After the trial concluded, the jury convicted Diaz of the above-referenced offenses. A Sexually Violent Predator ("SVP") hearing was held prior to sentencing, in which Paula Brust from the Sex Offender Assessment Board ("SOAB") testified as an expert. Brust testified that she is a licensed

professional counselor in Pennsylvania and had been employed by the SOAB since 2002. N.T. Sentencing, 6/13/23, at 9-10. She stated that she had performed approximately 1,550 assessments for the SOAB and had testified as an expert approximately 400 times. *Id.* at 10-11.

Brust conducted an evaluation on Diaz, in which she considered, *inter alia*, the following: the SOAB investigator report; Luzerne County court order for assessment; defense attorney response; Child Line indicated report; the criminal information, complaint, and affidavit; Luzerne County CAC evaluation; the jury trial slip; the plea agreement; Luzerne County court order dated 11/17/22; Wilkes-Barre police report, complaint, and warrant; and an excerpt of jury trial proceedings. *Id.* at 22. Based on her assessment, she concluded that Diaz was an SVP. *Id.* at 28.

The court determined that the Commonwealth met its burden and deemed Diaz to be an SVP. *Id.* at 43-44. The court then sentenced Diaz to an aggregate term of 60 to 180 months' incarceration. Diaz filed post-trial motions, which were denied. This appeal followed.

Diaz raises the following issues:

> A. On March 8, 2022, did the [c]ourt err in granting the Commonwealth's Rule of Evidence 404(b) Motion to admit testimony of alleged instances of extra-jurisdiction, uncharged sexual assaults between [Diaz] and the alleged victim from the summer of 2019 and New Years of 2019/2020?
>
> B. On January 23, 2023, did the [c]ourt err in allowing Lieutenant Stash to testify in violation of Pennsylvania Evidence Rules 701 and 702 regarding lay and expert testimony?

C. On January 23, 2023, did the court err in sustaining the Commonwealth's objection to fair and admissible questioning during the cross examination of Lt. Stash?

D. On January 23, 2023, did the [c]ourt err in denying [Diaz's] Motion for Judg[ment] of Acquittal on all charges despite the Commonwealth's failure to establish the necessary facts to support all criminal charges?

E. On June 13, 2023, did the [c]ourt err in both accepting Paula Brust to testify as an expert, and utilize her testimony to conclude Diaz to be a Sexually Violent Predator?

Diaz's Br. at 8 (suggested answers and answers by the trial court omitted).

Diaz first argues that the court erred in admitting his sexual assault allegations that occurred in New Jersey and Mountain Top, Pennsylvania in 2019 and 2020. *Id.* at 16. He maintains that this evidence should not have been admissible under Rule of Evidence 404(b) as a common plan, scheme, or design because Diaz's "alleged 2019 and 2020 [] incidents lack the requisite similarities to establish a common scheme." *Id.* Diaz points out that all purported instances involve Diaz and the same complainant, "with extreme variety in details that preclude an inference of a broader common plan." *Id.* He argues that "[t]here is nothing unique in the type, manner, or sexual conduct alleged" and "[a]ll occurrences were at different times and locations, and in different manners." *Id.* at 17. According to Diaz, the testimony was "impermissible propensity evidence guised as common plan evidence[.]" *Id.*

Diaz further argues that the court erred when it admitted Diaz's allegations in New Jersey and Mountain Top based on the *res gestae* exception. *Id.* at 18. He maintains that prior bad acts evidence may be

admissible as *res gestae* only where the evidence will furnish the complete story, and here, the victim's trial testimony about the Luzerne County incidents, in conjunction with the Commonwealth's other witnesses, was independent of and not reliant upon the other abuse allegations. *Id.* at 18-19.

Diaz further maintains that the admissibility of these alleged prior bad acts caused him unfair prejudice. *Id.* at 21. He argues that the court should have found that any probative value was outweighed by its prejudicial effect. *Id.* at 23. He maintains that the trial court's curative instruction to the jury on this issue was ineffective to mitigate its prejudicial effect. *Id.* Diaz argues that "[t]he instruction also failed to explicitly caution the jury against using the evidence to infer [his] propensity or predisposition to commit the charged offenses." *Id.* at 24.

The admission of evidence is within the discretion of the trial court and will only be reversed where there is an abuse of that discretion. See *Commonwealth v. Radecki*, 180 A.3d 441, 451 (Pa.Super. 2018). An abuse of discretion exists where the court overrides or misapplies the law or exercises judgment in a way "that is manifestly unreasonable, or the result of bias, prejudice, ill will or partiality, as shown by the evidence of record." *Id.* (citation omitted).

Rule 404(b) of the Pennsylvania Rules of Evidence bars admission of evidence of prior bad acts to establish a person's character and to prove that the person acted on a particular occasion in conformity with that character.

Pa.R.E. 404(b)(1). However, evidence of prior bad acts is permissible for some other, proper purpose, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2). In criminal cases, "this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." *Id.*

Another exception to the inadmissibility of prior bad acts evidence is the "*res gestae*" or "complete story" exception. *See Commonwealth v. Carter*, 320 A.3d 140, 149 (Pa.Super. 2024). Under this exception, evidence of other criminal acts is admissible "to complete the story of the crime on trial by proving its immediate context of happenings near in time and place." *Commonwealth v. Brown*, 52 A.3d 320, 326 (Pa.Super. 2012) (citation omitted). This exception applies where the acts "were part of a chain or sequence of events which formed the history of the case and were part of its natural development." *Commonwealth v. Knoble*, 188 A.3d 1199, 1205 (Pa.Super. 2018) (citation omitted).

A further exception exists in cases involving a challenge to the admission of evidence of a prior sexual act.

> In general, evidence of other wrongful conduct not charged in the information on which the defendant is being tried is inadmissible at trial except in certain limited circumstances. One such exception arises in the prosecution of sexual offenses. Evidence of prior sexual relations between defendant and his or her victim is admissible to show a passion or propensity for illicit sexual relations with the victim. This exception is limited, however. The evidence is admissible only when the prior act involves the same victim

- 9 -

and the two acts are sufficiently connected to suggest a **continuing course of conduct**. The admissibility of the evidence is not affected by the fact that the prior incidents occurred outside of the statute of limitations.

*Commonwealth v. Wattley*, 880 A.2d 682, 686 (Pa.Super. 2005) (quoting *Commonwealth v. Knowles*, 637 A.2d 331, 333 (Pa.Super. 1994) (emphasis in *Wattley*).

In *Knowles*, a jury convicted Knowles of sexually abusing his minor step-granddaughter. 637 A.2d at 332. On appeal, Knowles argued that the trial court erred in admitting evidence of his prior, uncharged sexual assaults of the victim that occurred in Texas approximately five to seven years earlier. *Id.* at 333. This Court concluded that the evidence was admissible and "relevant to show that [Knowles] had a continuing passion for illicit sexual contact with [the victim,] and acted on that passion when the opportunity arose." *Id.* In doing so, we noted:

> The prior conduct need not be precisely the same conduct as that giving rise to the criminal charges. It is enough that a reasonable inference can be drawn of "a passion or propensity for illicit sexual relations with the particular person concerned in the crime" for which the defendant is being tried. Here, the conduct of appellant toward his wife's granddaughter was sufficiently similar, and the evidence was that it occurred whenever appellant had an opportunity to engage therein.

*Id.* at 334 (internal citations omitted).

Here, the trial court found that evidence of the uncharged sexual assaults was properly admitted pursuant to Rule 404(b). It explained:

> [T]he New Jersey and Mountain Top sexual assaults were clearly relevant and sufficiently connected to the Wilkes-Barre assault to suggest a continuing course of conduct. J.T. testified that [Diaz] sexually assaulted her in New Jersey and then continued to do so when she returned to her home in Wilkes-Barre and then again in Mountain Top when she moved. [Diaz] claims that the court and jury were confused as to which act occurred where and when . . ., but the testimony clearly set forth when and where the events took place. The evidence was necessary to provide the jury with the complete history of the case, including [Diaz's] attempts to groom the victim and his increasing levels of sexual assault against her. In addition, the evidence was necessary to show that the events of the case did not appear in a vacuum but were instead a continuing chain of events.

Trial Ct. Op. at 18-19.

The court did not abuse its discretion. A review of J.T.'s trial testimony establishes that Diaz's sexual assaults of J.T. in New Jersey and Mountain Top and his substantially similar sexual assaults of J.T. in Wilkes-Barre were "sufficiently connected to suggest a continuing course of conduct." **Wattley**, 880 A.2d at 686. The sexual assaults occurred in a similar manner when J.T. and Diaz were alone, or with very few people around. The acts in New Jersey occurred while J.T. was temporarily living with Diaz over the summer. The acts stopped when J.T. returned to her mother, but resumed when Diaz would visit J.T. and when they lived together in Pennsylvania. As in **Knowles**, the evidence here was that the assaults occurred whenever Diaz "had an opportunity to engage therein." 637 A.2d at 334. The evidence provided the history of the case and showed why J.T. did not immediately disclose the assaults, especially since Diaz had made repeated threats to her. **See**

*Commonwealth v. Dillon*, 925 A.2d 131, 139 (Pa. 2007) (finding evidence of appellant's prior abuse of the minor sexual assault victim's family members was properly admitted because the evidence was probative of the reasons for victim's delay in reporting the sexual assaults and "was also relevant *for res gestae* purposes, *i.e.*, to explain the events surrounding the sexual assaults, and resulting prosecution so that the case presented to the jury did not appear in a vacuum").

Further, as set forth above, the trial court gave the jury two cautionary instructions regarding the limited purpose for which it could consider the bad acts evidence. *See* N.T. Trial at 81, 175; *Dillon*, 925 A.2d at 141 ("[W]hen weighing the potential for prejudice, a trial court may consider how a cautionary jury instruction might ameliorate the prejudicial effect" of Rule 404(b) evidence). "It is presumed the jury follows the court's instructions." *Commonwealth v. Speight*, 854 A.2d 450, 458 (Pa. 2004). Diaz's first claim fails.

Diaz next argues that the court erred in allowing Lieutenant Stash to testify as an expert in violation of Pennsylvania Rules of Evidence 701 and 702. Diaz's Br. at 26. He asserts that Lieutenant Stash made several speculative claims as to the victim's mental state – including "it was immediately apparent to me that they really needed my help," "there was some trauma there," and "it was immediately apparent to me that this girl had been the victim of some type of sexual crime" – without there being a proper foundation. *Id.* at 27. Diaz maintains that determining whether

someone has been a victim of a sexual crime is in "the realm of a psychologist or some other expert in understanding human emotions and behaviors, not a Lieutenant." *Id.* at 27-28.

The record reveals that Diaz failed to object to Lieutenant Stash's testimony at trial. Diaz, in fact, concedes that his counsel failed to object. *See* Diaz's Amended Post-Trial Motion, filed 6/19/23, at ¶ 48. Because Diaz's counsel failed to timely object, Diaz failed to preserve this issue for appellate review. Diaz has therefore waived this claim on appeal. *See* Pa.R.A.P. 302(a) ("[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal"); *Commonwealth v. Bryant*, 855 A.2d 726, 740 (Pa. 2004) (failure to raise contemporaneous objection at trial waives claim on appeal).[2]

Diaz next argues the court impermissibly restricted his cross-examination of Lieutenant Stash about J.T.'s medical report. Diaz's Br. at 28. He contends that he should have been permitted to elicit testimony from Lieutenant Stash that J.T.'s medical exam results were normal. *Id.* at 29. Diaz alleges that the court erred when it "improperly sustained Commonwealth objections to Diaz'[s] cross examination of Stash about facts from a medical report of which he had personal knowledge." *Id.* at 13.

---

[2] Although Diaz raised the issue in his post-trial motion, this did not cure his failure to preserve the issue. *See Commonwealth v. Baumhammers*, 960 A.2d 59, 73 (Pa. 2008) (rejecting appellant's claim that objections not contemporaneously raised in the lower court were preserved "by virtue of having been set forth in post-sentence motions").

During cross-examination of Lieutenant Stash, the following exchange occurred:

[DEFENSE COUNSEL]: As part of [J.T.'s] investigation in the CAC she underwent a physical examination, correct?

[LT. STASH]: Yes.

[DEFENSE COUNSEL]: And following the examination the doctor compiled a report, right?

[LT. STASH]: Yes.

[DEFENSE COUNSEL]: And you reviewed that report?

[LT. STASH]: Yeah, I did.

[DEFENSE COUNSEL]: And that report indicated that [J.T.'s] genital --

[THE COMMONWEALTH]: Objection. Could we have a sidebar, Your Honor?

(Whereupon, the following occurred at sidebar:)

[THE COMMONWEALTH]: So I actually was going to make a motion in limine prior but I waited for this time. I'm just going to ask that Lieutenant Stash be precluded from giving any type of testimony relating to the outcome or any type of medical opinion as to what the medical exam showed. We don't have an expert for that. Defense doesn't have an expert for that. She can ask that there was a wellness exam, but getting into what that exam revealed and showed, I'm asking that it be precluded.

[DEFENSE COUNSEL]: Your Honor, I'm not asking for his opinion about the results of the exam, I'm just asking for what he did during his investigation process that led to the filing of charges. I'm not asking him to testify to what his findings were, what his take on the exam was.

THE COURT: What question were you in the process of asking? . . .

- 14 -

[DEFENSE COUNSEL]: I believe, he reviewed the report and that the findings were normal and that was the last question I had about the medical exam.

THE COURT: What question are you going to ask?

[DEFENSE COUNSEL]: That he reviewed the doctor's report and that there was no abnormal finding.

THE COURT: So you're going to ask, Detective, there was an exam. Yes, there was an exam. Did you review the report? Yes, I did. What did the report say?

[DEFENSE COUNSEL]: Essentially, yes.

THE COURT: And the report says the exam was normal?

[DEFENSE COUNSEL]: Yes.

[THE COMMONWEALTH]: I just want to make sure we're not going into the part where her genitals were examined.

THE COURT: If that's all that there is, do you have an objection to that, or your objection is you don't want to go deeper than that?

[THE COMMONWEALTH]: I'm saying he could only be asked if there was a medical exam and if he reviewed the report.

THE COURT: So you don't think he can say what the results are even if it's just the results were normal?

[THE COMMONWEALTH]: I think he should be precluded from that. He's a lay witness. He doesn't have any medical experience. I don't have an expert coming in to say what it means. It's going to be confusing to the jury if they think, well, how could she be claiming she was raped if the exam is normal?

THE COURT: Right. What if [defense counsel] were to ask, Detective, as a result of the physical exam is there any physical evidence that these assaults took place?

[THE COMMONWEALTH]: That's fine because I already – on direct he already said there wasn't. So that's fine.

THE COURT: Limit it to that.

[DEFENSE COUNSEL]: Yes, Your Honor. Thank you.

- 15 -

N.T. Trial at 99-102.

The court then went back on the record and defense counsel asked Lieutenant Stash if he reviewed J.T.'s medical report and he replied, "Yes." *Id.* at 102. Defense counsel marked the medical report as an exhibit and showed it to Lieutenant Stash. *Id.* at 103. The following then occurred:

> [DEFENSE COUNSEL]: Your Honor, I'm showing Lieutenant Stash what been marked as Defendant's Exhibit 1.
>
> [LT. STASH]: Okay. What was your question again?
>
> [DEFENSE COUNSEL]: That the result of the examination was that there was no physical evidence that the assaults had taken place, correct?
>
> [LT. STASH]: It states that it's normal. I don't know that I could say no to that. It's just the report says that it's normal.

*Id.*

The above testimony confirms that defense counsel did, in fact, elicit testimony from Lieutenant Stash that J.T.'s medical exam results were normal. The record thus belies Diaz's contention that he was prevented from eliciting such testimony. Since Lieutenant Stash testified that the results were normal, which was defense counsel's objective in this line of questioning as she stated at sidebar, Diaz has failed to prove he suffered any harm. This claim fails.

Diaz next argues that the court erred in denying his motion for judgment of acquittal because the evidence was insufficient to support his convictions. He asserts that the admission of his alleged sexual acts in New Jersey and Mountain Top impermissibly tainted the jury. Diaz's Br. at 31. Diaz points out

that "[t]he Commonwealth presented the testimony of the alleged victim in one continuous story from New Jersey, Wilkes-Barre, and Mountain Top" which could have caused the jury confusion since "the jury could have seen all of these as part of the same criminal action, not separated by year, month, or location." *Id.* He further emphasizes that there was no physical evidence presented by the Commonwealth to support the charges and only limited circumstantial evidence was presented to suggest that he and the alleged victim had been near each other. *Id.* at 31-32. According to Diaz, "[t]his complete lack of evidence, outside of the jumbled testimony of one witness and those who believe her, means that the Commonwealth's case is based on nothing more than mere speculation and conjecture." *Id.* at 32.

"A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge, and is granted only in cases in which the Commonwealth has failed to carry its burden regarding that charge." ***Commonwealth v. Emanuel***, 86 A.3d 892, 894 (Pa.Super. 2014) (citation omitted).

Here, after the Commonwealth's case-in-chief, Diaz moved for judgment of acquittal on counts one, two, and three, which the court granted. ***See*** N.T. Trial at 111-116. However, he did not move for judgment of acquittal on counts four, five, and six. ***See id.*** at 115 (defense counsel stating, "Your Honor, I do not have an argument with regard to [counts four, five, and six]"). Diaz has thus waived this issue on appeal. ***See Commonwealth v. Richard***, 150 A.3d 504, 516 n.6 (Pa.Super. 2016) (finding appellant's issue waived

pursuant to Pa.R.A.P. 302(a) for failure to raise it before the trial court when presenting his motion for judgment of acquittal).[3]

Diaz's final argument is that Paula Brust should not have been allowed to testify as an expert as to whether Diaz was an SVP, as the subject in which she was qualified as an expert is not created by the applicable statute. Diaz's at 32. He notes that 42 Pa.C.S.A. § 9799.24 covers assessments to determine whether a person is an SVP after conviction. *Id.* Diaz argues that nowhere in the statute does it refer to the person who conducts such an assessment as an "expert" or "specifically denotes any such field of expertise." *Id.* at 32-33.

_____

[3] We note that Diaz raised a sufficiency of the evidence challenge in his amended post-trial motion and Rule 1925(b) statement. However, Diaz only argued in those filings that the Commonwealth failed to establish where and when the alleged events occurred and that the prosecution's evidence was nothing more than conjecture and speculation. *See* Diaz's Amended Post-Trial Motion, filed 6/19/23, at ¶¶ 99-100; Diaz's Concise Statement of Matters Complained of on Appeal, filed 11/13/23, at ¶¶ 22-23. Moreover, Diaz's Rule 1925(b) statement fails to state with specificity the elements upon which Diaz alleges that the evidence was insufficient. "In order to preserve a challenge to the sufficiency of the evidence on appeal, an appellant's Rule 1925(b) statement must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient." ***Commonwealth v. Garland***, 63 A.3d 339, 344 (Pa.Super. 2013). "Such specificity is of particular importance in cases where, as here, the appellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt." *Id.* (citation omitted). We thus additionally find Diaz's sufficiency claim waived on these grounds. To the extent the vagueness of the 1925(b) statement may have been cured by the trial court's interpretation of it in the context of the litigation below, the evidence was sufficient to prove guilt for the reasons the trial court states. ***See Commonwealth v. Rogers***, 250 A.3d 1209, 1224 (Pa. 2021); Trial Ct. Op. at 25-27.

Diaz additionally argues that in finding Diaz to be an SVP, Brust considered alleged evidence of prior sexual misconduct by him other than what was proven at trial. *Id.* at 33. Diaz takes issue with the fact that Brust, in making her determination, considered the victim's statement to the Child Advocacy Center, in which she detailed the alleged past abuse by Diaz, "which occurred outside the Commonwealth and were not corroborated by any outside evidence or verification from the agencies Brust received documentation from." *Id.* at 34. Diaz acknowledges that while Brust was permitted to rely on inadmissible evidence in forming her decision, such as records from reputable agencies within the Commonwealth, he argues that the victim's statement to the Child Advocacy Center does not have the same reliability or veracity as records from official agencies. *Id.* at 33-34. We find these claims to be without merit.

"A challenge to a trial court's SVP designation presents a challenge to the sufficiency of the evidence for which our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Aumick**, 297 A.3d 770, 776 (Pa.Super. 2023) (*en banc*). "A challenge to the sufficiency of the evidence to support an SVP designation requires the reviewing court to accept the undiminished record of the case in the light most favorable to the Commonwealth." **Id.** "The reviewing court must examine all of the Commonwealth's evidence without consideration of its admissibility." **Id.**

In determining whether a person is an SVP, an SOAB evaluator's assessment must include, but is not limited to, an examination of the following factors:

(1) Facts of the current offense, including:

(i) Whether the offense involved multiple victims.

(ii) Whether the individual exceeded the means necessary to achieve the offense.

(iii) The nature of the sexual contact with the victim.

(iv) Relationship of the individual to the victim.

(v) Age of the victim.

(vi) Whether the offense included a display of unusual cruelty by the individual during the commission of the crime.

(vii) The mental capacity of the victim.

(2) Prior offense history, including:

(i) The individual's prior criminal record.

(ii) Whether the individual completed any prior sentences.

(iii) Whether the individual participated in available programs for sexual offenders.

(3) Characteristics of the individual, including:

(i) Age of the individual.

(ii) Use of illegal drugs by the individual.

(iii) A mental illness, mental disability or mental abnormality.

(iv) Behavioral characteristics that contribute to the individual's conduct.

(4) Factors that are supported in a sexual offender assessment field as criteria reasonably related to the risk of reoffense.

42 Pa.C.S.A. § 9799.58(b).

Within 90 days of a defendant's qualifying conviction, the SOAB must prepare a written report containing its assessment which includes, at a minimum, the following information:

> (1) A concise narrative of the offender's conduct.
>
> (2) Whether the victim was a minor.
>
> (3) The manner of weapon or physical force used or threatened.
>
> (4) If the offense involved unauthorized entry into a room or vehicle occupied by the victim.
>
> (5) If the offense was part of a course or pattern of conduct involving multiple incidents or victims.
>
> (6) Previous instances in which the offender was determined guilty of an offense subject to this subchapter or of a crime of violence as defined in section 9714(g) (relating to sentences for second and subsequent offenses).

*Id.* at § 9799.58(d), (d)(1).

This Court has held that "[a] SOAB expert opinion falls within the general rules regarding expert witnesses." *Aumick*, 297 A.3d at 777. Accordingly, a witness who has been qualified as an expert under Pennsylvania Rule of Evidence 702 may testify as an SVP expert. *Id.* Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

Like any other expert witness, an SVP expert may, pursuant to Rule 703, rely on facts and data not in evidence if experts in the field reasonably rely on facts and data of the same sort:

> [A] SOAB expert's opinion may be based on facts or data that the expert has been made aware of or personally observed so long as experts in the particular field reasonably rely on those kinds of facts or data in forming an opinion on the subject; the facts or data consulted need not be admissible for the expert's opinion to be admitted. **See** Pa.R.E. 702, 703 . . . The SOAB expert must state the facts or data on which the opinion is based. **See** Pa.R.E. 705 and Comment (explaining otherwise inadmissible facts and data supporting expert opinion are considered only to explain the basis for an expert's opinion, not as substantive evidence). Then, the rules of evidence place the full burden of exploration of facts and assumptions underlying the testimony of an expert witness squarely on the shoulders of opposing counsel's cross-examination. . . . Opposing counsel bears the burden of exposing and exploring any weaknesses in the underpinnings of the expert's opinion.

**Aumick**, 297 A.3d at 781 (citation omitted).

Further "in the context of an SVP hearing, the judge is not tasked with evaluating the veracity of the facts underlying the expert's testimony." **Id.** at 782. "[T]he facts presented at an SVP hearing are not being offered for the truth of the matter asserted, as would be the case in a true hearsay scenario." **Id.** "Instead, they constitute information, gleaned from records which are

reasonably relied on in SOAB evaluations, that is presented to the trial court solely to supply the basis for the expert's opinion in accordance with our Rules of Evidence." *Id.*

In *Aumick*, we held that the SOAB properly considered "the affidavit of probable cause, criminal information, criminal complaint, preliminary hearing transcript, and the investigative reports prepared by Child Protective Services when assessing [the appellant]." *Id.* at 781. We reasoned:

> The statute governing the SVP assessment does not limit the expert's consideration of information only to that admitted at trial or at the guilty plea proceedings. In fact, the statute requires state, county, and local agencies, offices or entities to provide copies of records and information as requested by the SOAB in connection with an SVP assessment, without limitation on the "admissibility" of that information . . . As a result, it stands to reason that some if not many of the facts necessary to perform the SVP assessment might not have been proven beyond a reasonable doubt.

*Id.* (citation omitted). We further found that

> it is clear that the legislature intended that the SOAB member consider more than the limited facts included in a plea colloquy, and that the SOAB member undertake to review and consider the information contained in records provided by state, county and local agencies, offices and entities in this Commonwealth when making an SVP assessment and preparing a statutorily compliant written report. To be sure, it would be the rare occasion on which the SOAB member would be able to fulfill its statutory obligations if its SVP assessments and written reports were limited to facts contained in a plea colloquy, admitted into evidence, or determined by the trier of fact.

*Id.* at 782.

Here, the court properly qualified Brust as an expert. As set forth above, Brust testified that she is a licensed professional counselor and has received SOAB training on topics including "risk assessment, sexually violent predator determinations, report writing, recidivism, and treatment[.]" N.T. Sentencing at 15. She has worked for the SOAB since 2002, performed approximately 1,550 assessments for the SOAB, and testified as an expert approximately 400 times. That was sufficient to qualify her as an expert in conducting SOAB evaluations, pursuant to Rule 702. Diaz's objection that the area of expertise was not statutorily created is without merit. *Aumick*, 297 A.3d at 777.

Furthermore, the court properly relied on her testimony to find Diaz is an SVP. She testified that she reviewed numerous documents and records, including the CAC evaluation, in making her assessment. *See* N.T. Sentencing at 22. Pursuant to *Aumick*, Brust's review of this information was not only permissible, it was required by statute. Further, there is no indication in the record that Brust gave the evaluation undue weight and there is nothing inherently unreliable about a report issued by the CAC, a non-profit organization. Moreover, the court did not rely on this information as substantive evidence in its determination that Diaz was an SVP because it was not presented for the truth of the matter asserted but rather to explain the basis of Brust's opinion. *See Aumick*, 297 A.3d at 782. The court properly relied on Brust's opinion to conclude Diaz qualified as an SVP. *See id.* We discern no error in the court's determination.

Judgment of sentence affirmed.

- 24 -

Judgment Entered.

![signature of Benjamin D. Kohler]

Benjamin D. Kohler, Esq.
Prothonotary


Date: 04/03/2025