J-A06002-24

2024 PA Super 157

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| PARIS ELIAS CARTER | : | |
| | : | No. 432 WDA 2023 |

Appeal from the Order Entered April 10, 2023
In the Court of Common Pleas of Butler County Criminal Division at
No(s): CP-10-CR-0000935-2021

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and BECK, J.

OPINION BY LAZARUS, P.J.:                    **FILED:  July 25, 2024**

The Commonwealth of Pennsylvania appeals from the order,[1] entered in the Court of Common Pleas of Butler County, granting Defendant Paris Elias Carter's motion *in limine* to preclude "other bad acts" evidence from being admitted in Carter's criminal homicide trial.[2]  After careful review, we affirm in part and reverse in part.  Specifically, we affirm that portion of the trial court's order excluding evidence showing that, while in Atlanta, Georgia, Carter non-fatally shot his brother, Dante Carter,[3] in the back of the head in a ride-share vehicle and we reverse that portion excluding evidence of Carter's flight to Atlanta.

_____

[1] This interlocutory appeal is properly before this Court.  *See* Pa.R.A.P. 311(d).

[2] *See* 18 Pa.C.S.A. § 2501(a).

[3] For clarity, we will refer to Paris Carter as Carter, and to Dante Carter as Dante.

The facts of this case are as follows. On May 17, 2021, around noon, four individuals—Tashane Henry, David Hines,[4] Dante,[5] and Carter,[6]—shared drinks at a bar in New Castle, Pennsylvania. *See* N.T. Preliminary Hearing, 6/30/21, at 7. Henry testified that, on that date, he was aware that Hines owned two firearms, and, while at the bar, Henry observed that Hines possessed one firearm while Carter possessed the other. *Id.* at 23. Henry saw the firearms in both Hines' and Carter's waistbands at the bar. *Id.* After leaving a second bar—where the group continued to eat and drink—the four men returned to Hines' girlfriend's[7] house, where everybody was "smokin'" and "chillin'." *Id.* at 7.

_____

[4] Hines—Henry's close friend with whom he spent time daily—was referred to as "Chop" at the preliminary hearing. *See* N.T. Preliminary Hearing, 6/30/21, at 6, 44.

[5] Henry referred to Dante as "Tay" at the preliminary hearing and testified that he grew up with him. *See* N.T. Preliminary Hearing, 6/30/21, at 5. Henry knew Hines through Dante. *Id.* at 16.

[6] Henry referred to Carter as "Little" at the preliminary hearing. Henry testified that Carter is his "cousin through [a] cousin," and stated that, at the time of the shooting, Henry had known Carter for about three years, and, although not related, Henry sees Carter as a "blood cousin," and "let him sleep on his grandma's couch." *See id.* at 4-5, 17. Henry testified that Carter and Dante were from Philadelphia and, at the time of Hines' shooting, were planning on living with Hines at Hines' apartment in New Castle because they were "basically homeless." *Id.* at 5, 15. At the time of the shooting, Carter and Dante were staying with Henry because Hines' apartment was not yet ready for the Carter brothers to move in. *Id.* at 18.

[7] This individual's name does not appear of record, and Henry did not know it at the preliminary hearing. *Id.* at 33.

At some point, Hines told the group that he wanted to drive to Pittsburgh that day and wanted the others to join him on the ride. *Id.* at 8. There was a "little dispute" between Hines and Carter on the porch, but Henry testified that it "wasn't deep at all," and everyone was "chillin'," "rappin'," "shaking hands, [and] smokin' [a marijuana blunt] together."[8] *Id.* at 8, 25-26. On cross-examination, Henry testified that both Carter and Hines, during their brief argument, each told the other, "[I'm] like you[, too]." *Id.* at 27. Henry further detailed—though perhaps not very clearly—the brief encounter, which, he said, lasted less than one minute, as follows:

> And I [(Henry)] was like: ["]What you all talking about?["] He's like[,] "it was like nice." Kept saying that, ["]I'm like you and you's like me.["] And I'm like[, "]What you all talking about?["] Like, ["T]his my man, this my cousin, and that's that. It ain't nothing." They shook hands and went back to smokin' and chillin' and talkin'.

*Id.*

At some point that afternoon, Henry agreed to join Hines on the proposed trip to Pittsburgh. *Id.* at 8. After an hour or so at Hines' girlfriend's house, at approximately 3:00 p.m., the four men left in Hines' girlfriend's silver Jeep and headed for Pittsburgh. At some point during their trip, the group "smoked a blunt," *id.* at 29, and after leaving a gas station, Henry was driving, Hines was in the front passenger seat, Dante was seated behind Hines, and Carter behind Henry. *Id.* at 9. Henry testified that Hines and

_____

[8] Henry also testified that Hines was the only person who continued drinking after the men left the bars, but Hines was not intoxicated when the group departed for Pittsburgh at approximately 3:00 p.m. *Id.* at 28.

Carter continued to possess firearms at this point.  *Id.* at 29.  Further, Henry explained that while driving on the highway after leaving the gas station, seemingly unprompted and without warning, Carter fired three shots at Hines' head, missing with the first shot but hitting Hines twice thereafter, killing Hines instantly.  *Id.* at 9-10, 31, 35.  Henry testified that he was blinded by the gunpowder from the shots fired.  *Id.* at 35.  Henry further testified that, immediately after the shooting, Carter stated, "I heard you was about this, [] you bitch," which Henry took to mean that Carter was stating that Carter was "a gangster."  *Id.* at 36, 39.

Henry explained that he was unaware of any conflict between Carter and Hines at that point.  *Id.* at 10, 31, 33-35.  Henry further described that, within seconds of the shooting, he was shaking and pulled over the car, *id.* at 10-11, 39, and asked why Carter had shot his friend, Hines.  Carter then demanded to drive and took over driving the group for a short period, speeding down the highway, before exiting it.  *Id.* at 11, 39.  Henry testified that Carter drove for approximately fifteen minutes before pulling over "on a weak part of the rocks," *id.* at 11, that gave way under the weight of the car, causing the Jeep to tilt and become stuck at that location.  *See id.*

Henry explained that, once the silver Jeep became stuck, Carter, with a hand in his pants, urged the men to run away through the woods.  *Id.* at 11.  Henry, Dante, and Carter, left the vehicle on foot, leaving Hines deceased in the passenger seat of the Jeep.  The men eventually arrived at a campground.  *Id.*

Angelina Lopez, Henry's girlfriend at the time, testified at the preliminary hearing that she picked up the three men from that campground in her gold minivan.[9] *Id.* at 11, 54-55. Lopez testified that no one wanted to talk during the drive back from the campground and the men told her that Henry and Carter had gotten into an argument. *Id.* at 56. Once back at Henry's residence, Henry testified that he showered, and he and Carter then abandoned their clothes in a nearby dumpster. *Id.* at 11.

About thirty minutes after arriving at Henry's residence, Lopez testified that there was a conversation in the backyard wherein Carter admitted to the shooting, as follows:

> [] [Carter] came outside. [Carter] started shaking his head. And I said[, "]What happened, what really happened, why were you arguing[?"] And he said[, "]Man,["] and he just kept shaking his head. And he said[, "]I had to get him out of here, I had to down him.["] And I said[, "D]own who[?] What are you talking about[?"] I kept asking what he was talking about. I said, ["W]hat, did you drop somebody?["] . . . And he said[, "N]o.["]
>
> And he said, ["M]an, man," and he kept going like this. And I said[, "]What happened, what happened[?"] And he said[] [Henry] told him to come outside and to talk to me about what happened. And then [Henry] comes outside, and he said[, "]Tell her, tell her, tell her what really happened. Tell her that you killed my man.["] And I ran[, and said, "W]ho the 'f' did you kill?["] And he said[, "]Tell her that you killed Chop, tell her you killed Chop.["] And I took my food in the house and I put the chicken that I was going to put on the grill and I put it in the refrigerator.

---

[9] The Commonwealth alleges that surveillance video recordings corroborate this event, but no video was shown. *Id.* at 11.

- 5 -

*Id.* at 56-57, 66. When asked to elaborate on the statements relating to "down[ing] his man," Lopez testified as follows:

> He said . . . he had to ["]down him.["] And I said[, "D]own who? Who are you talking about?["] That's what I said[, "]What did you do?["] And then he said[, "]Man,["] and then I said[, "]What did you do?["] And he said[, "]I had to down him. I had to get him, get him going, get him outta here,["] or something like that. And I said[, "Did you fuckin' kill somebody?["] And he said[, "]Man,["] – and [Henry] said[, "]Tell her, tell her you killed my man, you killed my man."

*Id.* at 57. Lopez further testified that, during that conversation, although he never expressly admitted to the shooting, Carter stated, "He had to go. He had to go." *Id.* at 67. After that conversation, Dante was crying on the floor and told Carter, "Man[,] you're so young, you got so much potential." *Id.* at 58. Thereafter, at Henry's residence, Carter informed Henry that he wished to be brought to Philadelphia so he could then proceed to Atlanta. *Id.* at 12.

The following day, at approximately 9 a.m., Henry, Lopez, their four children,[10] Carter, and Dante, drove to Philadelphia in Lopez's gold van. *Id.* at 44. At some point during the drive, police pulled the van over, and Henry and Lopez both testified that, as the officer approached the stopped van, Carter let a gun fall under the baby seat and retrieved it immediately after the officer left. *Id.* at 46, 59, 68-69. Henry and Lopez dropped off Carter and Dante in Philadelphia and eventually reported the murder to police.

From Philadelphia, the Commonwealth alleges that Carter and Dante made their way to Fulton County, Georgia. On May 20, 2021, police had Henry

_____

[10] The four children were ages 7, 3, 2, and a newborn infant. *Id.* at 43.

place a recorded call to Dante, in which he discussed why Carter shot Hines. The Commonwealth alleges that forty minutes later, Carter shot Dante in a ride-share vehicle, which shooting was recorded by surveillance cameras in the car. The Commonwealth also alleges that, during the investigation of that shooting, the ride-share driver told police that, while driving Carter and Dante, he heard a person on the other end of the phone with Dante tell Dante to hand Carter the phone, and the ride-share driver remembers Dante complying with that request. *See* N.T. Motion for Reconsideration/Clarification Hearing, 4/10/23, at 12.

The Commonwealth charged Carter with criminal homicide on August 24, 2021, in connection with Hines' murder. On December 30, 2021, the Commonwealth filed notice of its intent to admit evidence of the Georgia shooting against Carter in the Hines murder case, pursuant to Pa.R.E. 404(b). Specifically, the Commonwealth sought to introduce evidence that: (1) following Hines' shooting, Carter and Dante fled to Atlanta; (2) while in Atlanta, Carter shot Dante in the back of the head;[11] and (3) Dante survived the Georgia shooting. *See* Commonwealth's Pa.R.E. 404(b) Notice, 12/30/21, at 1.

On February 15, 2023, Carter filed a motion *in limine*, seeking to prevent the Commonwealth from introducing the evidence it identified in its Rule

_____

[11] The Commonwealth sought to introduce, in its case-in-chief, video evidence with audio, as well as still images of video recordings, all captured by cameras installed on the ride-share vehicle in Atlanta. The Commonwealth also sought to introduce the testimony of the ride-share driver.

404(b) notice. On April 3, 2023, the court issued an order finding it premature to rule on the motion *in limine*. The following day, the Commonwealth sought reconsideration and/or clarification of the court's decision. After a hearing, on April 10, 2023, the court granted Carter's motion *in limine*, prohibiting the Commonwealth "from introducing in its case-in-chief the evidence proffered in its [Rule 404(b)] Notice[.]" Order, 4/10/23.

On April 11, 2023, the Commonwealth filed an interlocutory appeal from the trial court's April 10, 2023 order, pursuant to Pa.R.A.P. 311(d). The Commonwealth and trial court have complied with Pa.R.A.P. 1925.

On appeal, the Commonwealth raises the following issue for our review: "Whether the trial court erred by granting [Carter]'s motion *in limine*, excluding evidence of [Carter] committing another shooting, where that evidence is a part of the history of the case and demonstrates [Carter]'s consciousness of guilt, flight, [and] a common plan, scheme, design and identity?" Appellant's Brief, at 3 (unnecessary capitalization omitted).

The Commonwealth claims that the court erred because evidence of flight is admissible to prove consciousness of guilt, even if the Commonwealth does not prove the defendant knew he was wanted for the crime. ***See*** Appellant's Brief, at 16-17, citing ***Commonwealth v. Harris***, 386 A.2d 108 (Pa. Super. 1978). Also, the Commonwealth argues that the court erred in excluding the evidence because a defendant's attempts to interfere with witness testimony is admissible to show consciousness of guilt. ***See*** Appellant's Brief, at 13, citing ***Commonwealth v. Rega***, 933 A.2d 997 (Pa.

2007). Finally, the Commonwealth claims the court erred because evidence of other crimes is admissible to prove a common scheme, plan, or design. *See* Appellant's Brief, at 19, citing ***Commonwealth v. Wable***, 114 A.2d 334 (Pa. 1955).

In support of its ruling on the motion *in limine*, the trial court reasoned that the evidence of flight and consciousness of guilt was inadmissible because neither is an allowable specified purpose set forth in Rule 404(b)(2). ***See*** Trial Court Opinion, 5/11/23, at 3. Also, the court found that the evidence of Carter's flight to Atlanta was inadmissible because Carter was not charged with flight to avoid apprehension, trial, or punishment, pursuant to 18 Pa.C.S.A. § 5126. ***Id.*** Moreover, the court determined that the circumstances of both shootings were not so related that they demonstrated a common scheme, plan, or design, where there were only two incidents, and the Commonwealth could rely on other evidence to prove its case. ***Id.*** at 3, 4. Finally, the trial court found that, even if the evidence were admissible under Rule 404, it was inadmissible under Pennsylvania Rule of Evidence 403 because the jury could not weigh the evidence impartially and would instead decide Carter's guilt on an improper basis. ***Id.*** at 3-4.

We review the court's decision granting a motion *in limine*, giving the court broad discretion, and using the same standard of review as applicable to the admission of evidence at trial. ***See Commonwealth v. Flamer***, 53 A.3d 82, 86 (Pa. Super. 2012).

The trial court's decision to admit evidence is subject to review for an abuse of discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

*Commonwealth v. Hairston*, 84 A.3d 657, 664-65 (Pa. 2014) (citations and quotation marks omitted). *See also Commonwealth v. DiStefano*, 265 A.3d 290, 297 (Pa. 2021) (appellant cannot meet heavy burden of establishing abuse of discretion by simply persuading appellate court that it may have reached different conclusion than trial court).

As to the admissibility of evidence at trial, it is well-established that:

All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible. Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact. Even if evidence is relevant, the court may nonetheless exclude it if its probative value is outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

*Commonwealth v. Gross*, 241 A.3d 413, 418-19 (Pa. Super. 2020) (citations and quotation marks omitted).

Our Supreme Court has explained that, pursuant to Rule 404, evidence of other crimes, wrongs, or other acts is inadmissible merely to prove a defendant's bad character or criminal propensity. *See Hairston*, 84 A.3d at 665.

[T]he purpose of this rule is to prevent the conviction of an accused for one crime by the use of evidence that he has committed other unrelated crimes, and to preclude the inference that because he has committed other crimes he was more likely

- 10 -

to commit that crime for which he is being tried. The presumed effect of such evidence is to predispose the minds of the jurors to believe the accused guilty, and thus effect[ive]ly to strip him of the presumption of innocence.

*Commonwealth v. Cox*, 115 A.3d 333, 337 (Pa. Super. 2015), quoting

*Commonwealth v. Spruill*, 391 A.2d 1048, 1049-50 (Pa. 1978).

Nevertheless, "[s]uch [other crimes, wrongs, or other acts] evidence is admissible . . . when relevant for another purpose, including motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake." *Hairston*, 84 A.3d at 665 (citations omitted). Indeed, Rule 404(b)(2) provides that such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2). "Unfair prejudice means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." *Commonwealth v. Green*, 271 A.3d 393, 402 (Pa. Super. 2021) (citation and quotation marks omitted).

The comment to Rule 404(b)(2) explains that the rule "contains a **non-exhaustive list of purposes**, other than proving character, for which a person's other crimes, wrongs, or acts may be admissible." Pa.R.E. 404(b)(2), comment (emphasis added). As to the timing of the other acts sought to be introduced, we note, "Rule 404(b) does not distinguish between prior and subsequent acts." *Commonwealth v. Wattley*, 880 A.2d 682, 685 (Pa.

- 11 -

Super. 2005). Pennsylvania courts have recognized various other permissible "purposes" for which the other acts evidence may be admissible; however, even though exceptions to Rule 404(b) exist, those exceptions "cannot be stretched in ways that effectively eradicate the rule." *Commonwealth v. Yocolano*, 169 A.3d 47, 58 (Pa. Super. 2017) (citation omitted).

First, Pennsylvania courts have recognized an exception to Rule 404(b) for proving the defendant's consciousness of guilt. *See Commonwealth v. Ivy*, 146 A.3d 241, 251 (Pa. Super. 2016). Further, our Supreme Court has noted that flight may constitute circumstantial evidence of consciousness of guilt. *See Commonwealth v. Housman*, 986 A.2d 822, 831 (Pa. 2009); *see also Commonwealth v. Jorden*, 482 A.2d 573, 579 (Pa. Super. 1984) ("evidence of flight is admissible as indicative of a defendant's consciousness of guilt").

Indeed, our Supreme Court has clarified that a trial court correctly informs the jury of the law by instructing that:

> [w]hen a person commits a crime, knows that he is wanted therefor, and flees or conceals himself, such conduct is evidence of consciousness of guilt, and may form the basis of a conviction in connection with other proof from which guilt may be inferred. It is permissible to infer that a defendant knows he is wanted for a crime from the circumstances attendant to his flight.

*Commonwealth v. Rios*, 684 A.2d 1025, 1035 (Pa. 1996) (citations, quotation marks, and brackets omitted).

Also, our Supreme Court has previously explained that "[a]ny attempt by a defendant to interfere with a witness's testimony is admissible to show a

- 12 -

defendant's consciousness of guilt." ***Rega***, 933 A.2d at 1009; ***see also Commonwealth v. Johnson***, 838 A.2d 663, 680 (Pa. 2003); ***Commonwealth v. Goldblum***, 447 A.2d 234, 243 (Pa. 1982) (evidence of defendant's attempts to have witness killed admissible for purpose of proving defendant's consciousness of guilt).

Second, Pennsylvania law recognizes the "*res gestae*" exception to Rule 404(b), "permitting the admission of evidence of other crimes or bad acts to tell 'the complete story.'" ***Hairston***, 84 A.3d at 665 (citations omitted). Other acts evidence is admissible under the *res gestae* exception where it "formed a part of a chain, or was one of a sequence of acts, or became part of the history of the event on trial, or was part of the natural development of the facts." ***Commonwealth v. Brown***, 342 A.2d 84, 90 (Pa. 1975) (citation and quotation marks omitted). ***See also Commonwealth v. Murphy***, 657 A.2d 927, 932 (Pa. 1995) (evidence showing defendant killed witness who saw defendant commit another murder so interwoven with facts of case as to be admissible under *res gestae* exception).

Third, another recognized exception to the rule prohibiting admission of evidence of other crimes or bad acts is for evidence of

> a common scheme, plan[,] or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the others or to establish the identity of the person charged with the commission of the crime on trial[—]in other words where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other.

> [E]vidence of other crimes is said to be admissible to prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused. Here[,] much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive as to be like a signature.

*Commonwealth v. Roney*, 79 A.3d 595, 606 (Pa. 2013) (citations, quotation marks, and brackets omitted).

Evidence of a common scheme, plan, or design may be relevant to establish any element of a crime. *See Commonwealth v. Einhorn*, 911 A.2d 960, 967 (Pa. Super. 2006). When considering whether the common scheme, plan, or design exception applies, the trial court must initially examine the details and surrounding circumstances of the other act(s) and the current criminal incident to determine whether the evidence reveals the sufficient similarities and details in the acts committed. *See Commonwealth v. O'Brien*, 836 A.2d 966, 969, 971 (Pa. Super. 2003) (noting that relevant factors for consideration in determining applicability of common scheme, plan, or design exception include: habits or patterns of action or conduct undertaken by perpetrator to commit crime, and time, place, and types of victims typically chosen by perpetrator).

We have previously specified certain factors that the court should consider when evaluating the similarities between the acts, including the elapsed time between the acts, the geographical proximity of the locations of the acts, and the manner in which the acts were performed or committed. *See Commonwealth v. Cain*, 29 A.3d 3, 7 (Pa. Super. 2011); *see also*

*Commonwealth v. Newman*, 598 A.2d 275, 279 (Pa. 1991) (commonality of roles and *situs* establishes common design and court must evaluate shared details, including perpetrator's actions, location of acts, and commonality of relationship between defendant and victims).

Here, initially, we agree with the Commonwealth that the evidence of Carter's flight to Georgia may be offered into evidence for permissible purposes that are recognized under Rule 404(b)(2), including to prove consciousness of guilt, *see Ivy*, *supra*; *Housman*, *supra*, and as part of the *res gestae* of Hines' death. *See Brown*, *supra*. We also conclude that, when reviewed on its own, the probative value of the evidence of Carter's **flight to Georgia** clearly outweighs any potential for unfair prejudice, and we discern no unfair prejudice. *See* Pa.R.E. 404(b)(2); *see also Commonwealth v. Coyle*, 203 A.2d 782, 789-90 (Pa. 1964) (evidence of flight had "clear and definite connection" to murder charged and was admissible to "show [] consciousness of guilt of the [initial] killing and the means employed to escape arrest," such that "the jury had the right to hear and consider this evidence"). Accordingly, we conclude that the trial court clearly erred in ruling all evidence of **Carter's flight to Georgia** is inadmissible under Rule 404(b)(2). *See Hairston*, 84 A.3d at 664-65.

Next, we further agree with the Commonwealth that under Rule 404(b)(2), evidence of Carter shooting Dante may be offered for the permissible purpose of proving Carter's consciousness of guilt, ***see***

*Goldblum*, *supra*, and as part of the *res gestae* of the case. *See Murphy*, *supra*.

We also agree with the Commonwealth that the evidence of Dante's shooting may be admitted for the permissible purpose of proving Carter's common scheme, plan, or design. *See Roney*, *supra*. Considering the relevant factors, *see O'Brien*, *supra*; *Cain*, *supra*; *Newman*, *supra*, there are significant similarities between Hines' and Dante's shootings including that: (1) they both occurred in a moving vehicle; (2) the victims were shot in the head from behind while seated in the front passenger seat; (3) the shootings took place seemingly spontaneously; (4) the shooter took or attempted to take the wheel of the vehicle immediately after the shootings; (5) the shootings occurred mere days apart; and (6) the victims are individuals who are close to Carter.

We also note that the trial court erred in concluding that two bad acts are insufficient to establish the common scheme, plan, or design exception. *See Roney*, *supra* at 606 (exception applies to "**the commission of two** or more **crimes** so related to each other that proof of one tends to prove the others") (emphasis added). *See also Commonwealth v. Tyson*, 119 A.3d 353, 360-63 (Pa. Super. 2015) (permitting **single prior rape** to establish common scheme, plan, or design).

Nevertheless, we cannot conclude that the trial court abused its discretion in finding that evidence of the Atlanta shooting has potential for unfair prejudice that outweighs its probative value. *See* Pa.R.E. 404(b)(2).

With the introduction of evidence of the Atlanta shooting—evidence the Commonwealth claims establishes that Carter shot and **attempted to murder his own brother**—the record supports the trial court's finding that there is a critical danger that the jury could confuse the issues with Hines' alleged murder, convict Carter on an improper basis relating to the fact that Carter attempted to kill Dante, or the jury might have been diverted from its duty of impartially weighing the evidence relating to Hines' death. Accordingly, we conclude that the trial court did not abuse its discretion in excluding all evidence of Dante's shooting in Georgia.[12] **See Hairston**, 84 A.3d at 664-65.

Although we have concluded that the evidence of Carter's flight to Georgia is admissible under Rule 404(b)(2), we must evaluate the trial court's further determination that this evidence is, on balance, more unfairly prejudicial than probative and therefore inadmissible pursuant to Rule 403. **See** Pa.R.E. 403; **see also Gross**, 241 A.3d at 418-19. Here, we conclude the trial court erred in excluding all evidence of **Carter's flight to Georgia** under Rule 403 because, as we have already found above in analyzing admissibility under Rule 404(b)(2), the probative value of the evidence of Carter's flight outweighs any potential for unfair prejudice to him.

---

[12] We note that since evidence of Dante's shooting is inadmissible, evidence proving that Dante "survived" the shooting is also inadmissible insofar as such evidence rests upon the presumption that an event was "survived." However, by this ruling, the Commonwealth is not prohibited from establishing that Dante is ignoring subpoenas to appear in this case. **See** N.T. Motion *In Limine* Hearing, 3/31/23, at 14.

Accordingly, the probative value of this evidence cannot be outweighed by a danger of unfair prejudice.  *See* Pa.R.E. 403.

In sum, we conclude that both evidence of a defendant's flight as well as evidence of the defendant's attempts at interfering with witness testimony are admissible under Rule 404(b) for the purposes of showing the defendant's consciousness of guilt and as part of the *res gestae* of the case.  We also conclude that, here, the evidence of the Atlanta shooting satisfies the common scheme, plan, or design exception to Rule 404(b).  Further, under these circumstances, we find that the trial court's conclusion that the evidence of witness interference was inadmissible under Rule 404(b) due its potential for unfair prejudice is supported by the record.  However, we conclude the trial court erred by excluding evidence of the defendant's flight under Rules 404 and 403.

Order affirmed in part and reversed part.  Case remanded for further proceedings not inconsistent with this decision.  Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE:  07/25/2024