J-S16036-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA    :    IN THE SUPERIOR COURT OF
   :        PENNSYLVANIA
   :
v.    :
   :
   :
   :
GEORGE W. WAKELEY, JR.    :
   :
Appellant    :    No. 1118 MDA 2024

Appeal from the Judgment of Sentence Entered June 26, 2024
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0000736-2023

BEFORE: LAZARUS, P.J., BOWES, J., and LANE, J.

MEMORANDUM BY LANE, J.:            **FILED: JULY 18, 2025**

George W. Wakeley, Jr. ("Wakeley"), appeals from the judgment of
sentence imposed following his convictions of eight counts of involuntary
deviate sexual intercourse ("IDSI") with a child, six counts of indecent assault
of a person less than thirteen years of age, and three counts of corruption of
minors.[1] After careful review, we reverse the conviction of one of the counts
of IDSI with a child, vacate the judgment of sentence imposed at that count,
and otherwise affirm the convictions and judgment of sentence.

In 2004, Wakeley began a romantic relationship with Wendy Stout.
Approximately four or five months later, Stout and her three sons from a prior
relationship moved into Wakeley's home in Warwick Township, Lancaster
County. Stout's sons, D.J., L.J., and K.J. (collectively, the "Victims"), were

_____

[1] 18 Pa.C.S.A. §§ 3123(b), 3126(a)(7), 6301(a)(1).

approximately eight, six, and four years old, respectively, when they moved into Wakeley's home. From 2004 to 2008, Wakeley engaged in numerous acts of sexual abuse with the Victims, including: touching the Victims' penises with his hand; performing oral sex on the Victims; forcing the Victims to touch his penis and perform oral sex on him; performing anal sex on D.J.; compelling the Victims to have manual and oral contact with each other's genitals; showing the Victims pornography; having sexual intercourse with Stout in front of the Victims; and forcing the Victims to insert their fingers in Stout's vagina.

The abuse ended in 2008, when D.J. and K.J. enrolled in a private boarding school. In 2013, D.J. called a local police station and revealed some of the abuse. However, he declined to participate when contacted by Northern Lancaster Regional Police Detective Eric Zimmerman ("Detective Zimmerman"). The Lancaster County Children and Youth Social Services Agency ("CYS") investigated the allegation and interviewed Stout, who denied that any abuse occurred. As a result of the CYS investigation, Stout terminated her relationship with Wakeley.

In 2018, D.J. contacted Detective Zimmerman and made a full report of the abuse. Ultimately, the Commonwealth charged Wakeley with the above-stated offenses. Notably, the Commonwealth premised two of the IDSI with a child charges and three of the indecent assault of a person less than thirteen years of age charges on a theory of accomplice liability. Specifically, at Count 7, the Commonwealth alleged that Wakeley committed IDSI with a child by

- 2 -

forcing L.J. "to perform fellatio on his brother." Information, 2/15/24, unnumbered 1.

Prior to trial, the Commonwealth filed a notice pursuant to Pa.R.E. 404(b), of its intent to introduce testimony from two additional minor victims of Wakeley's sexual abuse, identified as "Victim 4" and "Victim 5." The Commonwealth argued this evidence demonstrated that Wakeley engaged in a common scheme, plan, or design of sexually assaulting young children. Wakeley filed a motion *in limine* seeking to exclude the testimony of the two prior victims. He also requested the trial court exclude any testimony that his relationship with Stout "deteriorated sexually and physically, and that he compelled her to engage in sexual encounters with other men through Craigslist for money." Motion *in Limine*, 3/13/24, at ¶ 3. The trial court granted Wakeley's motion to exclude the testimony of "Victim 5" but denied the motion as to "Victim 4." The court denied Wakeley's request to exclude testimony related to his sexual relationship with Stout insofar "as the testimony relate[d] to circumstances in the home [that the Victims] observed." Order, 3/24/15, ¶ 3.

The trial court summarized the trial testimony of the Victims and Stout:

> The oldest of the boys was D.J. who was twenty-eight at the time of trial. D.J. testified that he was in second grade, around seven or eight years old, when his mother started to date Wakeley. Right before his third grade year, his mother moved him and his brothers, L.J. and K.J., in with Wakeley at Wakeley's home in [Warwick Township].
>
> D.J. was shown photos of the home and he described the interior of the home in detail. D.J. told the jury he recalled

Wakeley initially introducing him and his brothers to pornography on the computer and magazines. He testified that Wakeley would talk to the boys about sex and teach them about it. Specifically, Wakeley would tell the boys that they needed to know about sex and it was okay for Wakeley to teach them. According to D.J., Wakeley made the boys feel like "it was normal." [N.T., 3/18/24, at 132.]

D.J. testified that Wakeley began this activity right after the family moved in with Wakeley and then it progressed to getting his mother involved with Wakeley and his mother having sex in front of the boys. While Wakeley and his mother were having sex in front of the three boys, Wakeley would say it was okay to do that kind of stuff.

D.J. was asked to talk about incidents of oral sex between himself and Wakeley and Wakeley penetrating D.J.'s anus. D.J. testified that these incidents occurred after Wakeley would show the boys porn[ography] while telling the boys it was okay for Wakeley to touch the boys because it was normal.

While D.J. testified that most of the abuse occurred with just him and Wakeley, he later testified on cross examination that his mother would be nearby. On one occasion, D.J. testified about an incident involving his mother when he was instructed to touch his mother's vagina. D.J. explained that Wakeley had a collection of toys and Wakeley told D.J. he could have them if D.J. would put his hand in his mother's vagina. D.J. went on to explain that if they wanted toys, this was the only way they would be allowed to have them.

D.J. testified that the abuse from Wakeley stopped when he left for the [boarding school]. He explained that he never told anyone about the abuse while it was occurring because Wakeley made them feel like it was [okay] and everyone was doing that kind of thing. In 2013, however, D.J. tried to make a report by calling a couple of police stations and he recalled that he was to be interviewed by a police officer but he backed out. In 2018, he realized how much the abuse affected him and he found the police officer's card in his wallet from 2013 and called the officer to report the abuse.

The middle child, L.J., was age twenty six at the time of trial. He testified that he was in first grade when his mother started dating Wakeley and that they moved in with Wakeley pretty quickly. He testified that the first thing he was introduced to was

pornography. He recalled walking into the living room and seeing his mother giving oral sex to Wakeley who was sitting at the computer watching pornography. After that, L.J. testified that the abuse progressed to the boys being made to do sexual things to each other and to Wakeley.

L.J. testified that Wakeley taught him to "jerk off" to the magazines and then engag[ed] in oral sex with Wakeley. [N.T., 3/18/24, at 164.] L.J. also testified that he and his brothers were made to play with each other in a sexual manner. [L.J. stated that he only recalled "hand to penis" contact, and he denied being "forced to do oral sex on [his] brothers." N.T., 3/18/24, at 165, 171.]

L.J. recalled that the house had a "NASCAR room" which was where most of the abuse happened. [*Id*. at 162.] He also recalled an instance where they were enticed with a toy to place their finger into their mother's vagina. L.J. testified that each of the boys came into the NASCAR room one by one and his mom was laid on the couch. He observed Wakeley digitally penetrate . . . his mother's vagina and then Wakeley had each of the boys repeat that act. Afterward, L.J. recalled receiving a yellow Tonka dump truck as a reward.

On cross-examination and on re-direct examination, L.J. testified that he and his brothers never talked about what happened to them. He also stated that they are not close to each other.

K.J., the youngest of the three boys, was age twenty-four at time of trial. He testified that he was in kindergarten when he and his brothers and mother moved in with Wakeley. His first memory of Wakeley was when he came downstairs and he saw Wakeley sitting naked at the computer masturbating. From there, K.J. said things progressed to performing oral sex on Wakeley while Wakeley was in the living room watching pornography. K.J. testified that he would [make him perform oral sex on] his older brothers and recalled being made to stand around the bed with his brothers while Wakeley and his mother had sex. He recalled that Wakeley had them take their clothes off and masturbate while his mother and Wakeley had sex.

K.J. also testified that he would perform oral sex on Wakeley and touch Wakeley's penis with his hands. He recalled a specific incident when he was made to take his clothes off and perform oral sex on L.J.

. . . Stout[] testified that she had been married to Wakeley. She met Wakeley online around 2004 and she and her three boys moved in with Wakeley after dating for four or five months. Stout testified she left Wakeley in 2013.

When asked about physical discipline being used by Wakeley against the boys, Stout answered that they would be paddled with a wooden paddle on their bare bottom. This was corroborated by each of the boys when they testified.

Stout also testified that Wakeley had a lot of pornography in the home but she mostly observed him watching pornography on the computer[, including] girls dressed up like little schoolgirls. Wakeley told her [his pornography viewing] was . . . ["]what he was into[,] what he liked". [N.T., 3/18/24, at 104.]

Stout was then asked to describe what she saw Wakeley do with the children. She testified about one occasion when she walked in through the front door of the house and all three boys were naked rolling around on the floor. Wakeley was present in his underwear and a T-shirt, which, she stated, was how he would normally walk around the house. On this occasion, she saw the boys "naked wrestling." [*Id*. at 102.] On another occasion, she walked into a room, called the "NASCAR room," and saw L.J. and Wakeley who had his penis exposed. [*Id*.] She testified that both of them had a "deer-in-the-headlight kind of look." [*Id*. at 103.]

Stout admitted to a situation when Wakeley involved her children while she and Wakeley were in their bedroom engaging in their "own situation." [*Id*. at 104.] Stout testified that she was blindfolded during the incident. She stated she could hear all three boys in the bedroom with her and Wakeley and Wakeley kept saying, "I'm not hurting her. It is . . . for pleasure." [*Id*.] Stout then testified that Wakeley went into detail with the boys as to what he was doing to her[. S]he felt hands on her although she could not see who[,] but she believed that all three of her children touched her vagina.

In 2013, Stout left Wakeley after being investigated by [CYS] because D.J. had made a report that he had been molested. In 2018, when interviewed by police, Stout testified that she denied that anything had happened in the home but admitted that she lied to police because she was embarrassed and ashamed and she acknowledged that she would have been criminally charged.

When confronted on cross examination why she did nothing while her boys were being beaten with a board on their bare bottoms and screaming for her to help, Stout answered: ["]I failed them as a mother. That is what I did. I drank so I didn't hear things. I drank so I didn't see things.[" N.T., 3/18/24, at 121.] Stout also acknowledged that she was . . . being charged with three counts of indecent assault, three counts of endangering the welfare of children, and three counts corruption of minors.

Trial Court Opinion, 10/2/24, at 3-8 (footnotes and record citations omitted and some paragraph reformatting).[2]

"Victim 4," identified at trial as S.Q., testified to the following. In 1988, when she was approximately two years old, her mother began dating Wakeley. S.Q. and her mother moved into a house with Wakeley shortly thereafter. Wakeley regularly sexually abused S.Q., including by forcing her to perform oral sex on him, touch his penis, and grind on him while his penis was exposed. When Wakeley forced her to perform oral sex on him he would say "this is what Mommy does" and "Mommy swallows." N.T., 3/19/24, at 269.

The abuse frequently occurred when her mother was at work. S.Q.'s mother separated from Wakeley when S.Q. was in kindergarten. However, S.Q. continued to spend every other weekend with Wakeley, and the sexual abuse continued during the visits.

S.Q. described several instances of abuse that occurred when she was eleven years old. On one occasion, Wakeley asked her to look in a drawer,

_____

[2] For ease of review, when quoting the trial court in this decision, we have changed the court's references of "Defendant" to "Wakeley" and shortened the court's references of "Ms. Stout" to "Stout."

- 7 -

and she discovered the drawer was full of sex toys. Wakeley offered to use them on her or told her she could use them herself. Wakeley showed S.Q. pornography, including a picture of a woman having sex with a dog. Wakeley would frequently wrestle with her, during which he would touch her vagina and breasts over her clothing. Wakeley once set up an account for her on an internet dating chat room and encouraged her to discuss sexual matters with other users.

In 2000, S.Q. discovered Wakeley was not her biological father and reported the abuse to her mother. S.Q. had no further contact with Wakeley after 2000. S.Q. stated that the abuse began when she was younger than five years old and continued until 2000.

Detective Zimmerman testified that Wakeley agreed, in November 2022, to an interview in his home to discuss the allegations of abuse. However, Wakeley was not at his home at the scheduled time, and Detective Zimmerman subsequently learned that Wakeley had quit his job and moved. Swatara Township Police Officer Francisco Gonzalez testified that in December 2022, he responded to a call regarding a man — later determined to be Wakeley — who barricaded himself in a hotel room. When officers arrived, Wakeley stated he intended to kill himself because there was a warrant for his arrest and he did not want "to get taken on" the warrant. N.T., 3/19/24, at 226. Wakeley stabbed himself in the wrists, elbow, legs, and neck before officers forcibly entered the room.

The jury convicted Wakeley of all charges. On June 26, 2024, the trial court imposed the aggregate sentence of 64 to 140 years' imprisonment.[3] Wakeley filed a post-sentence motion, which the court denied. Wakeley then filed a timely notice of appeal. Both he and the trial court complied with Pa.R.A.P. 1925.

Wakeley presents the following issues for our review:

I. Did the trial court err in admitting the testimony of S.Q., where she testified to prior acts of . . . Wakeley which did not show that . . . Wakeley "used a common scheme or plan as it relates to the alleged offenses in this case," but served only to suggest that . . . Wakeley was a person of bad character, who had acted in conformity with that character in the instant case?

II. Did the trial court err in overruling defense counsel's objection to . . . Stout's testimony that other adults were involved in her sex life with . . . Wakeley, as this testimony was irrelevant, prejudicial, and did not set the stage for the alleged misconduct between . . . Wakeley and . . . Stout's children?

III. Was the evidence presented by the Commonwealth insufficient to prove beyond a reasonable doubt that . . . Wakeley was guilty via accomplice liability of Count 7, involuntary deviate sexual intercourse, for having L.J. perform fellatio on his brother, where there was no evidence that L.J. performed fellatio on either of his brothers?

Wakeley's Brief at 8 (suggested answers omitted).

_____

[3] Wakeley's aggregate sentence consisted of: three consecutive twenty-to-forty-year terms of imprisonment for IDSI with a child; three consecutive one-to-five-year terms of imprisonment for corruption of minors; and one consecutive one-to-five-year term of imprisonment for indecent assault of a person less than thirteen years of age. The court additionally imposed: five concurrent twenty-to-forty-year terms of imprisonment for IDSI with a child; and five concurrent one-to-five-year terms of imprisonment for indecent assault of a person less than thirteen years of age.

In his first issue, Wakeley argues the trial court abused its discretion by allowing S.Q.'s testimony under Rule of Evidence 404(b). We review a trial court's evidentiary rulings to determine whether the court abused its discretion. **See Commonwealth v. Smith**, 325 A.3d 513, 518 (Pa. 2024). "An abuse of discretion is not simply an error of judgment, but is an overriding misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will, or partiality." **Id**. at 519.

We note our well-established standard when addressing evidentiary challenges:

> All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible. Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact. Even if evidence is relevant, the court may nonetheless exclude it if its probative value is outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

**Commonwealth v. Carter**, 320 A.3d 140, 147-48 (Pa. Super. 2024) (citation omitted).

Pursuant to Rule 404(b), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). However, such other bad acts evidence may be admissible when relevant for other purposes, including to establish:

a common scheme, plan, or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the others or to establish the identity of the person charged with the commission of the crime on trial — in other words where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other.

*Carter*, 320 A.3d at 149 (citation and brackets omitted); *see also* Pa.R.E. 404(b)(2).

"When considering whether the common scheme, plan, or design exception applies, the trial court must initially examine the details and surrounding circumstances of the other act(s) and the current criminal incident to determine whether the evidence reveals the sufficient similarities and details in the acts committed." *Carter*, 320 A.3d at 149. Courts shall consider certain factors when addressing the similarity between the charged criminal acts and other bad act evidence, "including the elapsed time between the acts, the geographical proximity of the locations of the acts, and the manner in which the acts were performed or committed." *Id*. at 150. Courts may also consider "the time, place, and types of victims typically chosen by the perpetrator." *Commonwealth v. Tyson*, 119 A.3d 353, 359 (Pa. Super. 2015) (*en banc*) (citation omitted).

"In a criminal case[, other bad acts] evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2). "The [other bad acts] should not be shielded from the factfinder merely because it is harmful to [the defendant]; the question is whether evidence of [the bad acts] would be *unduly* prejudicial." *Tyson*, 119

A.3d at 361 (emphasis in original); *see also Commonwealth v. Hicks*, 151 A.3d 216, 224 (Pa. Super. 2016) (stating, "It is axiomatic in a criminal trial that all evidence offered by the prosecution will be prejudicial to the defendant"). "Where evidence of prior bad acts is admitted, the defendant is entitled to a jury instruction that the evidence is admissible only for a limited purpose." *Commonwealth v. Ivy*, 146 A.3d 241, 251 (Pa. Super. 2016) (citation omitted). Our Supreme Court has held that the trial court's issuance of a cautionary instruction may ameliorate any prejudice associated with the introduction of the bad acts evidence. *See Commonwealth v. Hairston*, 84 A.3d 657, 666 (Pa. 2014).

Wakeley argues that S.Q.'s testimony did not show he had a common scheme, plan, or design with respect to the sexual assaults against her and the Victims. Wakeley points to several alleged differences between S.Q.'s allegations and the charged offenses here: S.Q. was a female and the Victims were male; the assaults of S.Q. always occurred outside of her mother's presence, while Stout was sometimes present during the assaults on the Victims; and the abuse of the Victims were "far more broad ranging," while the abuse of S.Q. was "mostly in the form of covert sexual touching, such as pretending to wrestle her and touching and grinding on top of her clothing." Wakeley's Brief at 23.

Wakeley also contends that his abuse of S.Q. was remote in time from the abuse of the Victims because the former abuse ended in 1994, ten years before the latter abuse began in 2004. Finally, Wakeley argues that S.Q.'s

testimony was "extremely prejudicial" to him, as it portrayed him to the jury as "a serial sexual predator and a bad person." *Id*. at 24-25.

The trial court concluded that S.Q.'s testimony showed that Wakeley had a common scheme "to gain access to young children through their mothers" and sexually abuse them. Trial Court Opinion, 10/2/24, at 14. The court noted numerous similarities between the abuse of S.Q. and the Victims, including that: they were all his non-biological children; he was in a relationship with their mothers; all of the abuse occurred in Wakeley's home; and the abuse involved viewing pornography, touching, and oral sex. The court found that the lapse in time between the abuse of S.Q. and the Victims did not require preclusion, especially in light of the similarity of Wakeley's conduct.

The trial court further determined that the probative value of S.Q.'s testimony outweighed any prejudicial impact, particularly in light of "the graphic details testified to by" the Victims. *Id*. at 13. The court observed that it provided cautionary instructions before S.Q. testified and prior to jury deliberations, minimizing any prejudicial impact on the jury from the other bad act evidence.[4]

---

[4] ***See*** N.T., 3/19/24, at 263, 338 (trial court instructing the jury that the Commonwealth offered S.Q.'s testimony for the limited purpose to show that used a common plan or scheme in perpetrating the assaults of S.Q. and the Victims; the evidence may not be considered for any other purpose; and the evidence may not be considered to show that Wakeley was a person of bad character or had criminal tendencies from which guilt may be inferred).

Based on our review, we discern no abuse of discretion in the trial court's admission of the evidence of the sexual abuse of S.Q. *See Smith*, 325 A.3d at 518. Trial testimony showed that the abuse of the Victims and S.Q. was strikingly similar: Wakeley accessed S.Q. and the Victims through their mothers, with whom he was in a romantic relationship; the family home was the site of every incident of abuse; the abuse frequently occurred when the mothers were absent and he was caring for the children; Wakeley persuaded the children into performing sexual acts by stating that their mothers also engaged in such conduct; S.Q. and the Victims were of similar age during the abuse, ranging from approximately four to twelve years old; and the abuse of S.Q. and the Victims involved much of the same conduct, including showing the children pornography and forcing them to perform oral sex on him and touch his penis with their hands. Notwithstanding the minor differences described by Wakeley, S.Q.'s description of the abuse she suffered had such a logical connection with the Commonwealth's proof that it "naturally tend[ed] to show that" Wakeley abused the Victims. *Carter*, 320 A.3d at 149 (citation omitted); *see also Tyson*, 119 A.3d at 360 (holding prior sexual assault and charged acts at issue were sufficiently similar to show a common plan or scheme, where both victims were of same race and similar age; defendant was casually acquainted with victims before each assault; the assaults occurred in victims' bedrooms; and defendant had vaginal intercourse with both victims).

The evidence of the abuse of S.Q. was also not so remote to render her testimony inadmissible. Contrary to Wakeley's claims, S.Q. testified the abuse occurred regularly until 2000. *See* N.T., 3/19/24, at 279-80, 283. Therefore, only four years separated the prior acts involving S.Q. and abuse of the Victims. This Court has held that a five-year gap between a prior sexual assault and the charged conduct does not weigh against the admission of evidence of the prior act, particularly where the incidents are highly similar. *See Tyson*, 119 A.3d at 361 (determining five-year period between sexual assaults did not defeat admissibility of evidence of the prior crime and noting "the similarities of the two incidents render the five-year time gap even less important").

Additionally, the probative value of S.Q.'s testimony outweighed its potential for unfair prejudice to Wakeley. As we stated in *Tyson*, "[t]he substantial similarity between" S.Q. and the Victims' accounts gave the evidence of Wakeley's prior bad acts "considerable probative value." *Id*. S.Q.'s testimony was not unfairly prejudicial to Wakeley, as the details of her abuse were not more graphic than that suffered by the Victims. *See id*. The trial court's cautionary instructions to the jury — issued prior to S.Q.'s testimony and during the final charge of the jury prior to deliberations — was sufficient to ameliorate any undue prejudice resulting from the admission of that evidence. *See* N.T., 3/19/24, at 263, 338; *see also Hairston*, 84 A.3d at 666. As we conclude that the court did not commit an abuse of discretion

- 15 -

in admitting evidence of the abuse of S.Q., no relief is due on Wakeley's first issue.

In his second issue, Wakeley argues that the trial court abused its discretion by overruling his objection and permitting Stout to testify that other adults were involved in the couple's sex life. By way of background, we summarize that on direct examination, Stout testified that their relationship became "[s]exually weird" and he frequently involved "other couples" and strangers. N.T., 3/18/24, at 98. Wakeley objected, arguing that Stout's testimony related to "the weird . . . general sexual relationship" between the couple rather than anything the Victims observed. *Id*. at 99. He contended that her testimony was contrary to the court's ruling on his motion *in limine*, that evidence related to the couple's sex life was admissible only to the extent "the testimony relate[d] to circumstances in the home [the Victims] observed." Order, 3/24/15, at ¶ 3. The trial court overruled the objection on the grounds that Stout's testimony "sets the stage for what was going on" inside the home. N.T., 3/18/24, at 99.

The following exchange then occurred:

> [Commonwealth:] So I was asking what the sex life was like with [Wakeley]. You were describing it.
>
> [Stout:] Threesomes, other couples, adult book stores. They have little booths and theatres, just voyeurism, outdoor situations.
>
> Q. Okay. So for some of this sexual behavior, would this happen in your home . . .?
>
> A. Yes.

Q. And would the boys — I'm not asking if the boys would necessarily be in the room, but they would be in the home?

A. Yes, sometimes.

*Id*. at 99-100. The prosecutor then moved on to a different line of questioning.

On appeal, Wakeley argues Stout's testimony regarding the involvement of other adults in the couple's sex life was irrelevant to the charges in this case and contrary to the motion *in limine* ruling limiting her testimony to sexual matters the Victims personally observed. While Stout testified the Victims were sometimes home during the incidents, Wakeley avers nothing shows that the Victims observed the couple engage in sexual activities with other adults or that other adults were present during the abuse of the Victims. Wakeley contends that the trial court's error was not harmless. He claims prejudice from Stout's testimony in that it led "the jury to conclude that . . . Wakeley's sexual behavior was inappropriate even where the [Victims] were uninvolved or unaware." Wakeley's Brief at 30.[5]

_____

[5] The Commonwealth argues that Wakeley waived his argument by: (1) not specifically objecting to Stout's testimony that the couple's sex life involved "[t]hreesomes, other couples, adult book stores[,] voyeurism, [and] outdoor situations;" and (2) not raising the error in his Rule 1925(b) concise statement. N.T., 3/18/24, at 100. We disagree. Wakeley objected to Stout's initial mention that their sex life involved "other couples" and strangers and raised the issue of whether such testimony was consistent with the trial court's motion *in limine* ruling. *Id*. at 99. Following the court's ruling on his objection, Wakeley was under no obligation to renew his objection to Stout's testimony regarding the couple's sex life. *See* Pa.R.E. 103(b) (stating, "Once the court rules definitively on the record — either before or at trial — a party need not renew an objection . . . to preserve a claim of error for appeal"). Furthermore, Wakeley raised this issue in his Rule 1925(b) concise statement.

The trial court reasoned that Stout's testimony "provided insight into a dysfunctional family dynamic in which the [Victims] would not be sheltered from actively participating in adult sexual activity, including group sexual activity with Wakeley and their mother." Trial Court Opinion, 10/2/24, at 16. The court additionally concluded that, even assuming the admission of the testimony was in error, such error was harmless. The court found that the evidence of the sexual abuse suffered by the Victims was overwhelming in light of the "strikingly similar" testimony by each of the Victims. *Id*.

Upon careful review, we conclude that the trial court abused its discretion by permitting Stout's testimony regarding her engaging in sexual relations with Wakeley and other adults. *See Smith*, 325 A.3d at 518. While Stout testified that the Victims were sometimes in the home when she had sexual relations with other adults, she did not state that the Victims observed this conduct. The Victims also did not testify that they witnessed Stout and Wakeley engaging in sexual acts with other adults. Moreover, the court's allowance of such testimony was contrary to its motion *in limine* ruling permitting testimony regarding the couple's sex life only to the extent the Victims observed the conduct. Therefore, Stout's testimony regarding the couple's private sexual relationship was not relevant to the charges before the jury.

Nevertheless, we agree with the trial court that any error associated with the admission of Stout's testimony was harmless. "In the event of an erroneous admission of evidence, a verdict can still be sustained if the error

was harmless." ***Commonwealth v. Yocolano***, 169 A.3d 47, 53 (Pa. Super. 2017) (citation omitted). "Harmless error exists where the appellate court is convinced beyond a reasonable doubt that the erroneously admitted evidence could not have contributed to the verdict." ***Commonwealth v. Taylor***, 209 A.3d 444, 450 (Pa. Super. 2019) (citation omitted). Courts have found harmless error where "the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." ***Yocolano***, 169 A.3d at 53 (citation omitted).

Here, the Commonwealth presented overwhelming evidence proving Wakeley's guilt beyond a reasonable doubt.[6] ***See id***. Each of the Victims provided remarkably similar testimony regarding the sexual abuse, including such details as the location where it occurred — the "NASCAR room" — and the fact that Wakeley offered toys as rewards for participating in certain sexual acts. Stout confirmed much of the abuse, notwithstanding that she was admitting that she also perpetrated abuse on her sons. S.Q.'s testimony regarding the similar abuse she suffered also corroborated the Victims' accounts. Moreover, the Commonwealth presented evidence of Wakeley's consciousness of guilt when he failed to appear for an interview with Detective Zimmerman and subsequently fled and attempted suicide.

_____

[6] We specifically address the Commonwealth's proof as to Count 7, IDSI with a child, ***infra***.

- 19 -

Furthermore, the prejudice associated with the admission of evidence concerning Stout and Wakeley's sex acts with other adults was minor. Stout's testimony was brief, and the Commonwealth did not revisit the issue later during trial. The record was replete with other, properly admitted evidence regarding the couple's sex life, including that they had intercourse in front of the Victims and Wakeley forced the Victims to touch their mother's vagina. Because we find that the admission of Stout's testimony was harmless, Wakeley's second issue merits no relief.

In his final issue, Wakeley argues that the evidence was insufficient to prove his guilt through accomplice liability as to Count 7, which charged him with IDSI with a child for having L.J. perform oral sex on his brother. Our review of a sufficiency claim is well settled:

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the factfinder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the factfinder.

***Commonwealth v. Scott***, 325 A.3d 844, 849 (Pa. Super. 2024) (citation and brackets omitted and italicization added).

- 20 -

"A person commits [IDSI] with a child, a felony of the first degree, when the person engages in deviate sexual intercourse with a complainant who is less than 13 years of age." 18 Pa.C.S.A. § 3123(b). Deviate sexual intercourse includes oral sex. *See Commonwealth v. Oliver*, 946 A.2d 1111, 1113 (Pa. Super. 2008); *see also* 18 Pa.C.S.A. § 3101 (defining deviate sexual intercourse as, in relevant part, "[s]exual intercourse per os or per anus between human beings . . .").

Section 306 of the Crimes Code[7] defines accomplice liability, in relevant part, as follows:

**(a) General rule.**—A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.

**(b) Conduct of another.**—A person is legally accountable for the conduct of another person when:

(1) acting with the kind of culpability that is sufficient for the commission of the offense, he causes an innocent or irresponsible person to engage in such conduct[.]

* * * *

**(c) Accomplice defined.**—A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit it[.]

18 Pa.C.S.A. § 306(a)-(c)(1)(i).

---

[7] 18 Pa.C.S.A. §§ 101-9546.

Wakeley asserts that the Commonwealth did not present evidence showing L.J. performed oral sex on either of his brothers. In support, he avers that, while L.J. testified that Wakeley "would make [the Victims] do things to each other," L.J. stated that he only had manual, not oral, contact with his brothers' genitals. N.T., 3/18/24, at 162, 165. Wakeley notes that D.J. did not recall having oral sex with his brother and K.J. testified that Wakeley made him perform oral sex on his older brothers, but he did not recall receiving oral sex from them. In light of the absence of evidence that L.J. performed oral sex on either D.J. or K.J., Wakeley requests that this Court reverse his conviction at Count 7.

The trial court reasoned that L.J.'s testimony that Wakeley would make the Victims have sexual contact with each other, coupled with K.J.'s testimony that he performed oral sex on L.J., was sufficient to prove Wakeley's guilt as to Count 7. The court concluded that, based on this testimony, "the jury was free to believe that Wakeley forc[ed] L.J., as a child, to perform fellatio on his brothers[.]" Trial Court Opinion, 10/2/24, at 19.

The Commonwealth argues that the evidence was sufficient to establish Wakeley's guilt for Count 7 because it charged Wakeley with "hav[ing] L.J. perform fellatio **with** his brother." Information, 3/20/24, at unnumbered 1 (emphasis added). The Commonwealth states that "the use of the word 'with' in Count 7 reflects the scenario K.J. described in his testimony," where he performed oral sex on L.J. Commonwealth's Brief at 26. According to the

Commonwealth, "[w]hether a child is forced to receive or forced to perform oral sex, there would still be sufficient evidence to establish" IDSI. *Id*.

Based on our review, we conclude that the Commonwealth did not present sufficient evidence to prove Wakeley's guilt as to Count 7. *See Scott*, 325 A.3d at 849. Addressing the Commonwealth's argument first, we observe that the Commonwealth cites the amended information filed after trial, while the information in effect at the time of trial alleged that Wakeley forced L.J. "to perform fellatio *on* his brother." Information, 2/15/24, unnumbered 1 (emphasis added).[8] Even more important, the trial court instructed the jury that Count 7 "alleged [Wakeley] did command, encourage or request [L.J.] to perform fellatio *on* his brother." N.T., 3/19/24, at 346 (emphasis added); *see also id*. at 354 (trial court instructing jury on verdict sheet, which contained identical language). Based on the use of the preposition "on," we conclude that Count 7 only encompassed Wakeley's conduct of soliciting, commanding, or encouraging L.J. to perform oral sex on his brother.

With this background in mind, we turn to the relevant testimony. L.J. initially testified that "as things went on, [Wakeley] would make [the Victims] do things to each other, to him." N.T., 3/18/24, at 162. L.J. subsequently testified:

_____

[8] We note that Count 8 charged Wakeley with IDSI with a child for forcing *K.J.* "to perform fellatio on his brother." Information, 2/15/24, unnumbered 2. The relevant wording of Count 8 remained the same in the amended information filed after trial. *See* Information, 3/20/24, at unnumbered 2.

- 23 -

[Commonwealth:] You also said that he would have you touch some or more — at least one or more than one of your brothers?

[L.J.:] Yes.

Q. Tell me what would happen.

A. That was mainly just, like, physical, like, kind of play with each other in a sexual manner.

Q. Who would that be with?

A. Both brothers.

Q. Okay. And what – what kind of contact do you remember?

A. Like hand to penis.

Q. And did that happen one time, more than one time, or something else?

A. Multiple.

*Id*. at 165-66.

On cross-examination, L.J. testified as follows:

[Defense:] But you also were asked as to what he allegedly forced the brothers, for lack of a better word, to do?

[L.J.:] Yes.

Q. If I understood you correctly, you said just to touch the genital, like hand touching a penis of your brother, correct?

A. Yes.

Q. You did not — you were not forced to do oral sex on your brothers, correct?

A. Not that I recall.

Q. So you don't recall that at all?

A. No.

*Id*. at 171-72.

D.J. testified that he did not recall any instance when Wakeley forced him to have oral sex with L.J. or K.J. *See id*. at 144. K.J. testified to the following. Wakeley's abuse initially involved forcing K.J. to look at pornography and perform oral sex on him, and "it progressed to doing the same things to [his] older brothers, performing oral sex on them." *Id*. at 188. K.J. recalled a specific instance where he performed oral sex on L.J.:

> . . . I vividly remember standing at the bottom of [the kitchen] steps and him making us take off our clothes, and I remember him making me perform oral sex on [L.J.]. I don't remember it going the other way though.

*Id*. at 191. K.J. could not "remember having to do anything to" D.J. *Id*. On cross-examination, K.J. confirmed that Wakeley forced him to perform oral sex on both of his brothers. *See id*. at 200.

After careful review, we are constrained to conclude that the Commonwealth did not prove that L.J. performed oral sex on either of his brothers, the underlying act that forms the basis of Wakeley's criminal conduct under Count 7. L.J. testified to manual contact with his brothers' genitals and denied ever performing oral sex on them. D.J. also denied engaging in oral sex with his brothers. K.J. stated that he performed oral sex on both of his brothers and he recalled a specific instance of doing so to L.J., but he specifically denied "it going the other way." *Id*. at 191. As there was no testimony upon which the jury could find that L.J. performed oral sex on either of his brothers, we reverse Wakeley's conviction at Count 7, IDSI with a child, and vacate the judgment of sentence imposed by the trial court at that count.

Notwithstanding our ruling as to Count 7, we need not remand this matter for resentencing. As this Court has explained: "If our disposition upsets the overall sentencing scheme of the trial court, we must remand so that the court can restructure its sentence plan. By contrast, if our decision does not alter the overall scheme, there is no need for a remand." ***Commonwealth v. Thur***, 906 A.2d 552, 569 (Pa. Super. 2006) (citation omitted). Here, the trial court imposed a twenty-to-forty-year term of imprisonment at Count 7 concurrent to the identical sentence imposed at Count 1. Therefore, our decision does not alter the aggregate term of imprisonment Wakeley will serve. Accordingly, we reverse Wakeley's conviction at Count 7 and vacate his judgment of sentence at that count, affirm the remainder of Wakeley's convictions and the balance of his judgment of sentence, and do not remand. ***See id***. (holding that remand was not necessary where panel vacated the penalty imposed on one offense and did "not change the length of [the defendant's] incarceration").

Conviction of IDSI with a child at Count 7 reversed. Convictions at all other counts affirmed. Judgment of sentence vacated at Count 7 and affirmed in all other respects. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 07/18/2025