J-A15003-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| TYLER BRANDON FRYE | : | |
| | : | |
| Appellant | : | No. 764 MDA 2024 |

Appeal from the Judgment of Sentence Entered January 16, 2024
In the Court of Common Pleas of Cumberland County Criminal Division at
No(s): CP-21-CR-0001475-2022

BEFORE: BOWES, J., STABILE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.: **FILED: SEPTEMBER 4, 2025**

Tyler Brandon Frye appeals from the aggregate sentence of 108 to 220 months in prison following his convictions for involuntary deviate sexual intercourse ("IDSI") and sexual assault. We affirm.

This matter arises from a series of escalating incidents throughout March 2022 between Appellant and his wife, Amanda Frye, culminating in an attack by Appellant on March 29. The trial court summarized the pertinent background, based on the evidence presented at trial, as follows:

> Ms. Frye testified that during the month of March 2022, [Appellant] began accusing her of having an affair, hiring someone to "watch" him, and installing cameras and microphones in the house. He began regularly interrogating her about those accusations and further accused her of hiring someone to kill him. Ms. Frye stated that [Appellant] had always been jealous, but his behavior was becoming more extreme. [Appellant] made holes in the walls of the residence, rummaged through drawers and

---

[*] Former Justice specially assigned to the Superior Court.

closets, and dismantled electronics looking for listening devices. [Appellant] would often take [Ms. Frye's] cell phone and search through her contacts list and call logs. Each time, [Appellant] would destroy the phone after purportedly "catching her in a lie." Ms. Frye repeatedly denied all of [Appellant]'s allegations and even offered to take a polygraph test to assuage his fears. [Appellant] eventually only permitted Ms. Frye to use a flip-phone with a list of contacts that he approved.

Ms. Frye stated that [Appellant] made threats to harm her friends and family, and that if he ever found her "boyfriend," he would kill him. She testified that [Appellant] believed that she had new duct work installed in the house so someone could crawl through it and place listening devices in the house, and he said that if he ever found someone in the house "everyone was going to die." She testified that she was so scared of [Appellant] that she could not sleep or eat for weeks, noting that [Appellant] would wake her up several times a night to accuse her of infidelity and misdeeds.

Ms. Frye testified that [Appellant]'s behavior became physical. On one occasion, [he] accused [her] of misplacing a piece of paper and "held her by her throat against the wall." Ms. Frye stated that it hurt, and she was shocked that he did it. Ms. Frye [attested] that on another occasion, [Appellant] woke her, took her down to her office, and yelled at her about "stuff" on the computer. While he was yelling at her, he forced her to perform oral sex on him. Ms. Frye stated that "it happened so fast," that she was unable to say "no," but she did not give any indication that she consented to sexual contact at that time.

Ms. Frye then testified that [Appellant] at times employed the use of firearms during his episodes of erratic behavior. [On one occasion, he] was driving with a gun in his hand and screaming so loudly, "his veins were popping and he was in tears." Ms. Frye was so frightened, she asked [Appellant] to let her out of the vehicle, and he left her in the parking lot of Lowe's in Carlisle[, Pennsylvania]. Another time, they were driving in [Appellant]'s vehicle while [Appellant] was interrogating her with a gun in his hand. He abruptly drove into their backyard, where [Appellant] proceeded to get out of the vehicle because he was convinced that [the] neighbors were watching him. She stated that at that point, "nothing made sense and it made her feel like she was going crazy." She stated that she believed the gun was

loaded. [Appellant] then drove them down a wooded road near their house and tossed the gun out of the vehicle. Officers later retrieved the gun.

Another incident with a firearm occurred in the couples' master bathroom. Ms. Frye testified that [Appellant] was interrogating and intimidating her while holding a gun. Though the gun was not pointed at her, she stated that she did not know why he would need a gun to end an argument because she was not fighting back. She stated that [Appellant] continued to yell at her when the gun discharged, and the bullet went through the mirror above the sink in their bathroom in the direction of their daughter's bedroom. Ms. Frye testified that [Appellant] said that the discharge was an accident. Ms. Frye noted that there were several guns present in the home, and that [Appellant] was a collector of guns.

. . . .

[Appellant]'s erratic behaviors led Ms. Frye to seek a Protection from Abuse ("PFA") order. She testified that she initially sought the PFA [order] after the incident in which [Appellant] pinned her against the wall by her neck. After the temporary order was granted, Ms. Frye stated that she was staying with her parents when [Appellant] began to call her parents repeatedly begging for her to come home and give him another chance. Ms. Frye testified that she felt obligated to do so because they "were married and together for [thirteen] years and they had children together." She stated that she wanted to give him the benefit of the doubt to change, and that she did still love him. Ms. Frye testified that she withdrew the PFA and returned home with the conditions that [Appellant] never force oral sex upon her again, that he would "stop talking crazy," and that he would seek mental health treatment.

Trial Court Opinion, 9/25/24, at 3-7 (cleaned up).

On the evening of March 29, 2022, several days after the couple reunited, Ms. Frye came home from taking her daughter and stepson to McDonald's. Appellant summoned her to the basement and showed her duct work that he believed allowed someone to get into the house. Ms. Frye told

him that she needed to put their daughter to bed and went upstairs. Appellant later approached her in the couple's bedroom and started to kiss her. Ms. Frye did not want to engage in any intimacy at that time, but did not tell him "no." She felt that if she did not agree, things would potentially get violent. Ms. Frye described her mental state as "very scared and timid." N.T. Trial, 8/30/23, at 67. At some point, Appellant began having vaginal intercourse with Ms. Frye from behind while he was still wearing underwear. She indicated that he grabbed her hair and began pulling it violently, hurting her. Ms. Frye told Appellant to stop.

In response, Appellant forced Ms. Frye to perform oral sex upon him while she was pinned against the bed. Ms. Frye testified that Appellant then thought he heard a noise and turned around. She observed that Appellant had her personal pistol tucked into the waistband of his underwear, which she believed he had on him during the entire encounter. She implored him not to fire any rounds. While Appellant was distracted, Ms. Frye grabbed a robe and ran to retrieve her daughter. They then went to the house of their next-door neighbor and called 911.

Troopers Derek Leib and Matthew Rutt of the Pennsylvania State Police arrived at the couple's residence within several minutes. Trooper Leib primarily interacted with Appellant, noting that he was highly agitated. Appellant indicated to him that other people were in the house, which a subsequent search did not bear out. Trooper Leib also noticed several holes and slits in the walls throughout the home. Trooper Rutt looked in the

- 4 -

basement, finding additional holes in the siding and observing that parts of the ceiling had been pulled down.

Trooper Rutt subsequently interviewed Ms. Frye next door, noting that her demeanor appeared shocked and upset. He also photographed some scratch marks on her chest and neck area. Ms. Frye went to a local hospital where a sexual assault nurse examiner ("SANE") administered a rape kit. Ms. Frye told the nurse that the sexual encounter with Appellant began as consensual until he pulled her hair. The SANE nurse noticed abrasions on Ms. Frye's chest and back.

The Commonwealth thereafter charged Appellant with multiple crimes relating to the incident on March 29, 2022, including IDSI, simple assault, and recklessly endangering another person ("REAP"). Before trial, the Commonwealth filed a "Motion to Amend Information and to Admit Evidence Pursuant to Rule 404(b)," requesting leave to add a charge of sexual assault. Additionally, the Commonwealth sought permission to introduce at trial evidence of Appellant's conduct in the month leading up to the attack to explain why Ms. Frye's purported consent to the sexual encounter that night was made under duress. Following a hearing, the trial court granted the motion, allowing amendment of the information and tentatively permitting the Commonwealth to introduce the background testimony. The new sexual assault count related solely to acts performed on March 29, 2022, and did not describe which particular acts supported the offense.

The matter proceeded to a jury trial. The Commonwealth presented several witnesses who attested to the above. It also introduced a recording of the 911 call during which Ms. Frye could be heard screaming in the background. Appellant testified in his defense, claiming that all sexual contact on the evening in question was consensual. Particularly, he said that Ms. Frye was the one who initiated intimacy with him that evening because he told her that he wanted to leave the marriage, yet she wanted him to stay. Appellant attested that he did not want to go through with the act even after Ms. Frye began performing oral sex on him, and at one point he saw her handgun nearby and seized it for fear that she would shoot him. According to Appellant, after Ms. Frye left, he angrily kicked a hole in the wall. He disputed that he asked the responding troopers to search for other people in the house upon their arrival.

At the conclusion of trial, the jury found Appellant guilty of one count each of IDSI and sexual assault, acquitting him of simple assault and REAP. Notably, the general verdict slip did not delineate which specific conduct by Appellant constituted sexual assault. The trial court sentenced Appellant to sixty to one hundred and twenty-four months on the IDSI conviction and a consecutive forty-eight to ninety-six months for the sexual assault. After being given an extension of time to do so, Appellant filed a post-sentence motion in which he challenged, *inter alia*, that his conviction of sexual assault was against the weight of the evidence and that his corresponding sentence

for that crime should have merged with IDSI.  The trial court denied the motion after a hearing.

This timely appeal followed.  Both Appellant and the trial court complied with their respective obligations pursuant to Pa.R.A.P. 1925.  Appellant raises four issues for our review, which we have reordered for ease of disposition:

> I.    Whether the evidence presented at trial was insufficient to prove beyond a reasonable doubt that Appellant was guilty of sexual assault where the Commonwealth failed to prove consent was not given?
>
> II.   Whether the verdict was against the weight of the evidence so as to shock one's sense of justice?
>
> III.  Whether the trial court abused its discretion by denying Appellant a new trial at all counts where Appellant was denied a fair trial due to the erroneous admission of testimony regarding an alleged prior bad act which was not admitted for any proper purpose under [Pa.R.E.] 404(b)?
>
> IV.   Whether the sentence of the trial court was illegal where count seven[, relating to sexual assault,] was a lesser included offense of count one[, relating to IDSI,] and should have merged for sentencing purposes?

Appellant's brief at 8 (some capitalization altered).

In his first claim, Appellant challenges the sufficiency of the evidence relating to his conviction for sexual assault.  We consider Appellant's position mindful of the following well-settled standard of review:

> When reviewing a [sufficiency] claim, we face a question of law. Accordingly, our standard of review is *de novo*.  We view the evidence in the light most favorable to the Commonwealth, as the verdict winner, and we draw all reasonable inferences therefrom in the Commonwealth's favor.  Through this lens, we must ascertain whether the Commonwealth proved all of the elements of the crime at issue beyond a reasonable doubt.

The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, we may not weigh the evidence and substitute our judgment for the factfinder. Any doubts regarding a defendant's guilt may be resolved by the factfinder, unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact may be drawn from the combined circumstances.

*Commonwealth v. Roberts*, 293 A.3d 1221, 1223 (Pa.Super. 2023) (cleaned up). Additionally, "we consider all of the evidence actually admitted at trial and do not review a diminished record." *Commonwealth v. Koch*, 39 A.3d 996, 1001 (Pa.Super. 2011) (citation omitted).

Our Crimes Code defines the offense of sexual assault as follows: "Except as provided in [§§] 3121 (relating to rape) or 3123 (relating to [IDSI]), a person commits a felony of the second degree when that person engages in sexual intercourse or deviate sexual intercourse with a complainant without the complainant's consent." 18 Pa.C.S. § 3124.1.

With respect to consent, the law provides that "[t]he consent of the victim to conduct charged to constitute an offense or to the result thereof is a defense if such consent negatives an element of the offense." 18 Pa.C.S. § 311. However, there are certain circumstances where the apparent consent of a victim lacks efficacy:

**(c) Ineffective consent.--**Unless otherwise provided by this title or by the law defining the offense, assent does not constitute consent if:

. . . .

(4) it is induced by force, duress[,] or deception of a kind sought to be prevented by the law defining the offense.

18 Pa.C.S. § 311(c).

Concerning the sufficiency of the evidence to sustain his sexual assault conviction, Appellant argues that the Commonwealth specifically failed to prove the element of lack of consent relating to the intercourse he had with Ms. Frye on March 29, 2022. *See* Appellant's brief at 25. He highlights that Ms. Frye did not tell him "no" prior to the sexual encounter or otherwise indicate that she did not want to participate in sex. *Id*. at 26 (distinguishing *Commonwealth v. Prince* 719 A.2d 1086, 1090 (Pa.Super. 1998)). Rather, Appellant posits that the lack of consent arose only when she told him to stop after he began pulling her hair, at which point he did stop. *Id*. at 27. Appellant concludes:

> The Commonwealth offered no evidence to show that Ms. Frye made it evident that her "stop" referred to the sexual intercourse and not just the hair pulling. Additionally, despite testifying that she feared Appellant, Ms. Frye also testified that she had guns in the home and that guns including her personal gun were not secured.

*Id*. at 28. Appellant thus opines that there was a dearth of sufficient evidence as to lack of consent for the sexual encounter.

To the contrary, the trial court found that the evidence supported the notion that Ms. Frye did not give effective consent to the encounter because she was under duress. It summarized thusly:

> In the weeks prior to the incident, [Appellant] had at various points, held her by the neck against the wall, drove erratically with her in his vehicle while brandishing a firearm she believed to be

- 9 -

loaded, threatened to shoot her, and forced oral sex upon her. Ms. Frye testified that she believed that she had no choice but to consent to sexual intercourse that evening because if she did not, [Appellant] would have become violent, and she stated that during the encounter, she was very "scared and timid." During the entire encounter, Ms. Frye testified that [Appellant] had a loaded firearm on his person. After the encounter, Ms. Frye grabbed her daughter and fled the residence. Trooper Rutt testified that when the first 911 call came in, he heard a woman screaming in the background. Trooper Rutt [attested] that after the incident, Ms. Frye was upset and "almost in shock." [The SANE nurse] similarly testified that Ms. Frye appeared "fearful, crying, and upset," and she noted the presence of abrasions on Ms. Frye's chest and back.

Trial Court Opinion, 9/25/24, at 18-19.

For its part, the Commonwealth highlights caselaw standing for the proposition that resistance by the victim against a sexual assault is not required in order to sustain a conviction. **See** Commonwealth's brief at 17 (citing **Commonwealth v. Gonzalez**, 109 A.3d 711, 723 (Pa.Super. 2015)). It argues that based on Appellant's conduct throughout March 2022, Ms. Frye "was living in a constant state of fear" leading up to the event, which deprived her of sleep and the ability to eat well. **Id**. at 18. The Commonwealth contends that any reluctant assent by Ms. Frye to the sexual encounter was given under duress, and accordingly did not constitute effective consent. **Id**.

Upon review, we agree with the trial court and the Commonwealth that there was sufficient evidence underlying Appellant's sexual assault conviction, particularly as to lack of consent. Ms. Frye's testimony was that she believed she had no choice but to engage in the vaginal intercourse with Appellant based on the history of threats that he had made in the weeks preceding the event. This was supported by evidence of multiple instances wherein

Appellant disturbed Ms. Frye's sleep with accusations, threatened her and her family, physically harmed her, forced her to perform oral sex, and even fired a round inside of the home. A factfinder could therefore conclude that although Ms. Frye did not take any initial action to stop the assault from occurring on March 29, her apparent willingness to engage in the vaginal intercourse was the product of duress. As the Commonwealth correctly notes, resistance by a victim is not required. *Gonzalez*, 109 A.3d at 723. No relief is due.

Appellant next presents a challenge to the weight of the evidence. *See* Appellant's brief at 37-40. The following law applies to our review of Appellant's claim:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Arias*, 286 A.3d 341, 352 (Pa.Super. 2022) (cleaned up).

In arguing that the sexual assault conviction was against the weight of the evidence, Appellant highlights that both he and Ms. Frye testified to the

initial intercourse being consensual. *See* Appellant's brief at 39. He expounds:

[E]ven if the jury elected to give the testimony of Ms. Frye weight and not the Appellant's, they still would have ignored the fact that Ms. Frye did not tell Appellant she did not want to have sex. She did tell him to "stop," but this came only after he pulled her hair too hard. Her testimony did not make it clear if she wanted to stop having sex or if she merely wanted him to stop pulling her hair.

*Id*. at 39-40. Appellant therefore concludes that the conviction "shocks one's sense of justice" even if Ms. Frye's testimony was to be believed. *Id*.

The trial court aptly addressed this issue in its Rule 1925(a) opinion:

As to [the count for sexual assault], the finding of guilt beyond a reasonable doubt boils down to whether the jury reasonably believed that Ms. Frye's consent to sexual intercourse was not freely given because she was under duress. Both Ms. Frye and [Appellant] testified that Ms. Frye assented to sexual contact that evening. Ms. Frye, however, testified that she only assented . . . because she believed that if she had told [Appellant] that she did not want to engage in sexual intercourse at that point, "it would get violent from there," so she "submitted and did what he wanted." Ms. Frye [stated] that she was "very scared and timid" during the encounter. She gave lengthy testimony as to [Appellant]'s recent erratic behavior and use of firearms, as well as a previous sexual assault days prior to the incident. Both Trooper Rutt and [the SANE nurse] testified that when they encountered Ms. Frye that evening, she was upset. While presenting her testimony to the jury, Ms. Frye was often tearful and distressed.

Though [Appellant] testified that Ms. Frye had initiated the sexual contact and he was the one who stopped it, his testimony not only conflicted with Ms. Frye's account of the incident, but also with Trooper Rutt and Leib's accounts. The jury was free to give more credibility to Ms. Frye's testimony, and completely discount [Appellant]'s testimony if they saw fit. In doing so, it was not "truly shocking to the judicial conscience" of this jurist, and

- 12 -

overturning the jury's verdict as against the weight of the evidence would not have been appropriate.

Trial Court Opinion, 9/25/24, at 24-25.

We find no abuse of discretion with the trial court's analysis. Plainly, the court carefully examined the competing evidence before concluding that a new trial was not warranted. It correctly noted that Appellant's testimony conflicted with multiple other witnesses, which in turn supported the jury's determinations. In short, Appellant is not entitled to relief on this claim.

In his next issue, Appellant alleges court error in allowing the Commonwealth to introduce at trial evidence of an instance in March 2022 wherein Appellant forced Ms. Frye to perform oral sex on him.[1] *See* Appellant's brief at 41-46. "The admission of evidence is committed to the sound discretion of the trial court and our review is for an abuse of discretion." *Commonwealth v. Kane*, 188 A.3d 1217, 1229 (Pa.Super. 2018) (citation omitted).

Appellant's position depends upon the applicability of Pa.R.E. 404, which provides in pertinent part:

**(b) Other Crimes, Wrongs, or Acts.**

(1) *Prohibited Uses*. Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show

---

[1] As presented in his post-sentence motions and Rule 1925(b) statement, Appellant more generally attacked the court's decision to permit the Commonwealth to introduce any bad act evidence from March 2022. It is for the first time in his brief to this Court that Appellant particularizes his allegation of error by referencing the earlier occasion when Appellant forced Ms. Frye to perform oral sex.

that on a particular occasion the person acted in accordance with the character.

(2) *Permitted Uses*.  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b).

Our High Court has noted that "the rule contains a **non-exhaustive** list of purposes, other than proving character, for which a person's other crimes, wrongs, or acts may be admissible." ***Commonwealth v. Carter***, 320 A.3d 140, 148 (Pa.Super. 2024) (emphasis added, quotation marks omitted).  One recognized permissible purpose involves *res gestae*, which allows "the admission of evidence of other crimes or bad acts to tell the complete story." ***Id***. at 149 (citation omitted).  More specifically, "[o]ther acts evidence is admissible under the *res gestae* exception where it formed a part of a chain, or was one of a sequence of acts, or became part of the history of the event on trial, or was part of the natural development of the facts." ***Id***. (citations omitted).

Appellant argues that the evidence of the prior forced oral sex was not a part of the expected history of the case and did not explain Ms. Frye's failure to object when Appellant first started engaging in vaginal intercourse with her on March 29.  ***See*** Appellant's brief at 42.  He points to the fact that when Appellant had allegedly forced Ms. Frye to perform oral sex on him earlier in the month, she later chastised him, which negates her contention that she

- 14 -

was afraid. *Id*. at 43. Alternatively, Appellant contends that Ms. Frye's testimony at the hearing on the Commonwealth's motion did not so much show her fear of Appellant as it did her desire to go along with the sex to avoid the inconvenience of an argument. *Id*. at 43-44.

Appellant further maintains that the prior encounter of forced oral intercourse was unlike the charged incident, thereby reducing its probative value, because the charged event resulted from an initial consensual sexual experience but progressed therefrom. *Id*. at 45. Finally, he posits that there were numerous other incidents testified to by Ms. Frye that could support her indication of fear, namely the arguments between Appellant and Ms. Frye wherein he was in possession of guns. Thus, the probative value of introducing an uncharged sex crime was outweighed by its prejudicial value because it was unnecessary. *Id*. at 45-46.

Since Appellant's challenge before the trial court was generalized and did not focus with particularity on the prior forced oral sex, the trial court stated that Appellant did "not make mention of the specific information the [c]ourt permitted to be said at trial that he believes was unfairly prejudicial, so we cannot elaborate on specific testimony." Trial Court Opinion, 9/25/24, at 30. It nonetheless concluded generally that all the testimony concerning the various threats and instances of violence from March 2022 was important for the history of the case, which is particularly true in sexual assault matters like this one. *Id*. The court further cited caselaw standing for the proposition that testimony of a couples' abusive relationship "was relevant to rebut any

- 15 -

allegation" that the victim consented to intercourse. *Id*. at 31 (citing *Commonwealth v. Faison*, 297 A.3d 810 (Pa.Super. 2023)).

After review, we cannot conclude that the trial court abused its discretion. As discussed at length above, the crux of this case revolved around whether Ms. Frye consented to sexual intercourse and oral sex with Appellant. The evidence outlining the abuse she suffered in March 2022, including the previous occasion of forced oral sex, certainly was "part of the natural development of the facts" that culminated in the underlying incident at the end of March. *See Carter*, 320 A.3d at 149. It explained her fear of Appellant and why she obtained a PFA order against him. It was also necessary so that the jury could understand why she decided to withdraw the PFA and the conditions that she imposed on Appellant in exchange for doing so. This all occurred only a short time before the sexual assault at issue. Appellant has not convinced us that the probative value of this testimony was outweighed by its potential for unfair prejudice given its importance to the Commonwealth's case and the need for relaying to the jury the whole story of the relationship between Appellant and Ms. Frye that month.

In his final issue, Appellant argues that his sentences for IDSI and sexual assault should have merged for sentencing purposes. *See* Appellant's brief at 29-36. This challenge implicates the legality of his sentence, and as such "our standard of review is *de novo* and our scope of review is plenary." *See Commonwealth v. Watson*, 228 A.3d 928, 941 (Pa.Super. 2020).

This Court has previously explained:

Merger of criminal sentences is governed by § 9765 of the Pennsylvania Sentencing Code, which provides as follows:

No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765.

***Commonwealth v. Merced***, 308 A.3d 1277, 1282 (Pa.Super. 2024) (some brackets and quotation marks removed).

As discussed above, Appellant's sexual assault conviction required proof that he engaged either in sexual intercourse or deviate sexual intercourse with Ms. Frye without her consent. ***See*** 18 Pa.C.S. § 3124.1. On the other hand, a person is guilty of IDSI if he "engages in deviate sexual intercourse with a complainant: by forcible compulsion." 18 Pa.C.S. § 3123(a)(1). Our Crimes Code defines "deviate sexual intercourse" as, among other things, "[s]exual intercourse per os or per anus between human beings[.]" 18 Pa.C.S. § 3101. Finally, we note that "forcible compulsion subsumes a lack of consent," and therefore sexual assault is a lesser included offense of IDSI by forcible compulsion. ***See Commonwealth v. Banniger***, 303 A.3d 1085 (Pa.Super. 2023).

The question presented in this case is whether the sexual assault and IDSI charges arose from a single act. Appellant begins his argument by noting

that the Commonwealth did not charge multiple counts of sexual assault or request particularized findings by the jury, and accordingly the factual basis of the jury's determination was ambiguous since it was not clear if it was premised upon the initial vaginal intercourse or subsequent oral sex that occurred after Ms. Frye told him to stop. **See** Appellant's brief at 33-34. He concedes that if the sexual assault conviction stemmed from non-consensual vaginal intercourse, there would be no merger since this was distinct from the act comprising the IDSI conviction. **Id**. at 34. On the other hand, if it was based upon the forced oral sex, this would overlap with the conduct giving rise to IDSI and the counts would merge. **Id**. Appellant contends that in light of the ambiguity as to the specific act encompassed by the sexual assault charge, he should be "given the benefit of" the doubt that it was the same act as IDSI. **Id**. at 35 (discussing **Commonwealth v. Riley**, 811 A.2d 610 (Pa.Super. 2022)).

In addressing Appellant's claim, the trial court stated that "[t]he problem in this case . . . [is] not whether sexual assault is a lesser included offense of [IDSI], but rather that the same **conduct** was not alleged" in the two counts. **See** Trial Court Opinion, 9/25/24, at 21 (emphasis in original). It noted that the IDSI count, as charged, pertained to Appellant forcing his penis into Ms. Frye's mouth. **Id**. It then went on to explain that the sexual assault, however, was already a separate and completed act before Appellant began to force the oral sex:

Ms. Frye testified that [Appellant] wanted to have sex, and while they were on their bed, [Appellant] was vaginally penetrating her from behind. Though Ms. Frye stated that she had assented to the vaginal intercourse, her consent was under duress because she believed [Appellant] would become violent if she refused. At some point, [Appellant] began pulling her hair violently, and Ms. Frye told him to stop. Ms. Frye testified that she slid off the bed and told him to stop again. That ended the act of non-consensual vaginal intercourse and completed the crime. [Appellant] then forcibly shoved his penis into Ms. Frye's mouth, thereby commencing the act of oral intercourse by means of forcible compulsion.

*Id*. at 22-23 (quotation marks removed). The court opined that since each act was separate, merger was not warranted pursuant to § 9765. *Id*. at 23.

We concur with the trial court that the IDSI and sexual assault convictions do not merge for sentencing purposes. As discussed above, the evidence at trial fully supported the conviction for sexual assault based on the initial vaginal intercourse Appellant had with Ms. Frye. Moreover, although not challenged on appeal, the evidence further bore out that Appellant committed IDSI by forcible compulsion when he forced his penis into Ms. Frye's mouth after she told him to stop. Where different convictions are independently supported by distinct facts, we will not presume they arise from the same act or otherwise merge. *See*, *e.g.*, *Commonwealth v. Snyder*, 870 A.2d 336, 349-50 (Pa.Super. 2005) (upholding a trial court's decision not to merge sentences for IDSI and rape where the charges were supported by separate facts).

Additionally, we are not persuaded by Appellant's reliance on *Riley*. There, a defendant was acquitted of burglary and theft at trial but found guilty

as to general conspiracy. The trial court sentenced him as if the conspiracy arose from the burglary, resulting in a higher offense gravity score and harsher penalty. This Court reversed, stating that "in the absence of clear evidence of the jury's intent to the contrary, a general conspiracy verdict must be resolved in favor of the defendant, and may be construed only as a conviction of conspiracy to commit the least serious underlying offense for which the jury could properly have found the defendant to have conspired to commit." *Riley*, 811 A.2d at 620. *Riley* does not stand for the proposition that where there is sufficient evidence supporting two separate crimes, both of which the jury finds a defendant guilty of committing, we must presume that they arose from the same facts.

Based on the above, we have no cause to disturb Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary


Date: 09/04/2025